(No. MR 2391.–

*In re* WALTER A. ASCHER, Petitioner.

*Opinion filed May 22, 1980.—Rehearing
denied September 26, 1980.*

Francis X. Riley, of Glen Ellyn, for petitioner.

William C. Murphy, of Reid, Ochsenschlager, Murphy & Hupp, of Aurora, for the Committee on Character and Fitness for the Second Judicial District.

MR. JUSTICE UNDERWOOD delivered the opinion of the court:

The issue here is whether Walter A. Ascher is "of good moral character and general fitness to practice law" as required by our rules (73 Ill. 2d R. 701(a)) for admission to the bar of Illinois. The Committee on Character and Fitness for the Second Judicial District (Committee) reported that it could not so certify (73 Ill. 2d R. 708(c)). Ascher now petitions us to admit him to practice (73 Ill. 2d R. 708(a)), asserting the Committee's action to be arbitrary and unwarranted.

Petitioner passed the examination conducted by the State Board of Law Examiners in February 1979. On April 16, petitioner, as required by the Board, filed its form entitled "Additional Questionnaire and Statement of Applicant" supplementing the original questionnaire filed in November 1977 containing his original responses to questions concerning character, fitness and personal history. In the additional questionnaire, petitioner was asked whether he had "ever been a party (either plaintiff or defendant) to or otherwise involved in any action or legal proceeding either civil or criminal or quasi-criminal, including any proceedings in a juvenile court?" He responded: "No change." The fact was, however, that on the preceding November 2, 1978, a civil suit, Alloy Piping, Inc. v. Ascher et al., had been filed in the circuit court of

Du Page County, naming petitioner as a defendant. The allegations in that complaint, which was still pending, made serious charges of misconduct against him. It is largely the failure to disclose the existence of that lawsuit and the Committee's findings regarding the conduct of defendant upon which the suit was predicated which prompted the Committee's refusal to certify petitioner.

The plaintiff, Alloy Piping, Inc. (Alloy) alleged in count I of its complaint that petitioner occupied a fiduciary relationship to it since he had served as its tax accountant for three years and as its agent-broker for the purchase of real estate. Alloy also alleged that petitioner represented that he would act as Alloy's "agent-broker" in connection with the contemplated purchase of another tract of land, and that petitioner "controlled" this tract. Relying on those representations Alloy on April 18, 1978, signed a contract for the purchase of the property at a price of $120,000. The contract described the seller as "Bank of Lyons Trust No. 1737," and was signed by petitioner "as beneficiary of Bank of Lyons Trust No. 1737." Pursuant thereto, Alloy tendered to petitioner a check for $12,000 made payable to petitioner's real estate agency, as escrowee. It was additionally alleged that neither petitioner nor Trust No. 1737 held an interest in that real estate on April 18; that petitioner at that time knew that there existed a contract dated April 1 for the sale of the same land by another person, as beneficiary under Trust No. 1737, Bank of Lyons, for a price of $109,000; and that petitioner wilfully, maliciously and fraudulently withheld from Alloy his knowledge of the preexisting contract.

It was further alleged that petitioner violated his fiduciary duties to Alloy by failing to disclose that he, after learning of Alloy's interest, arranged for the sale of this real estate by the actual owners, Robert and Dorothy Freston, to Winfried and Mildred Kaczmarek for $100,000

pursuant to an agreement between the Kaczmareks and petitioner to share the profit from the subsequent sale to Alloy at the higher price; and that petitioner received a real estate commission on the Freston-Kaczmarek sale. It was further alleged in reference to the Freston-Kaczmarek sale that petitioner knew a $75,000 mortgage was given to the Frestons by the Kaczmareks and recorded, but that the existence of this mortgage was fraudulently withheld from Alloy.

It was also alleged that petitioner tendered to Alloy a Chicago Title and Trust Company commitment for title insurance in the amount of $120,000 which gave no indication of the existence of a mortgage on the covered property. The complaint also charged that the original commitment for title insurance, which was in petitioner's possession, was in the amount of $100,000 and noted the existence of the $75,000 mortgage. It was additionally asserted that petitioner not only fraudulently withheld this material information from Alloy, but had also altered the copy of the title commitment policy tendered to Alloy by deleting the reference to the mortgage and changing the amount of the policy from $100,000 to $120,000. It was further alleged that at or prior to the time of closing, petitioner forged the signatures of Winfried and Mildred Kaczmarek to the affidavit of title, warranty deed and closing statement, and that the warranty deed prepared by petitioner made no mention of the mortgage. In addition the complaint alleged that petitioner had fraudulently deposited a cashier's check for $106,952.76, made payable to the Bank of Lyons Trust No. 1737 and representing the amount due the sellers at closing, in his own account in his own name at the Elmhurst National Bank. Also alleged was Alloy's repeated demand upon petitioner for the clear title which Alloy had learned it did not have. Temporary injunctive relief, actual and punitive damages and a declaration holding petitioner in contempt of court for

the unauthorized practice of law were prayed.

Counts II and III of the complaint were directed toward Village Center Realty, Inc., and the Kaczmareks, and the entire complaint was verified. On December 22, an apparently unverified answer to the complaint was filed. Petitioner signed his attorney's name but with his own initials in parentheses. During oral argument counsel for petitioner submitted a motion, which we now allow, to supplement the record with a copy of a motion for summary judgment filed on behalf of petitioner and denied by the trial court.

Upon learning that this undisclosed suit was pending, and had been pending against petitioner at the time he completed the additional questionnaire, the Committee notified him and conducted a hearing during which some six witnesses, including petitioner, testified and numerous exhibits were admitted. It will be necessary to relate that evidence in some detail.

Following his 1962 graduation from high school, petitioner was employed by various companies for varying periods of time. He also attended several educational institutions on a part-time or evening basis, receiving an A.B. degree from Northeastern Illinois University in 1973. He commenced his law work on a part-time evening-class basis at John Marshall Law School in 1970. In 1975 he enrolled at Lewis University College of Law as a full-time student and graduated in January 1978. Since 1974 he has conducted an accounting business under the name of Ascher Accounting and has been a licensed real estate broker and agent doing business as Village Center Realty. He is also a licensed insurance agent and broker and an "enrolled agent" with the Internal Revenue Service. The "Certificate of Ownership of Business Firm" filed in the office of the county clerk of Du Page County under "An Act in relation to the use of an assumed name in the conduct or transaction of business in this State" (Ill. Rev.

Stat. 1977, ch. 96, pars. 4 through 8a) lists Walter Ascher as "owner of" Addison Legal Services, and John A. Darianzo as "(Transacting Business)". The business card for Addison Legal Services lists Walter A. Ascher as "business manager." "Addison Legal Services" was apparently adopted in November 1978 by Ascher and Darianzo as a business name and discontinued in May of 1979 when a new lawyer was informed by the Illinois State Bar Association that use of the name was improper.

During its existence Addison Legal Services shared with one of the two Village Center Realty offices and with Ascher Accounting approximately one-third of a building in Addison, owned by petitioner, the balance of which was rented to other small businesses. On the left front of that building above the windows in large letters appear the words

ACCOUNTING & TAX SERVICE    VILLAGE CENTER REALTY
    LAW OFFICES
      530-1020

In addition to the larger signs, there is a third sign, smaller and slightly below the other two, upon which appear the words "Cunningham and Wood, Attorneys at Law." There is a doorway between the large signs and a second doorway to the right of the realty sign. A diagram of the interior seems to indicate a partition separating the law office from the accounting and real estate offices with communicating doors between them. Apparently a single telephone number served all three. The Addison Legal Services stationery contained the name of John Darianzo as "of counsel." Cunningham and Wood are two attorneys admitted to practice in 1978. They apparently practiced in Aurora but were joining Addison Legal Services when Darianzo moved to Texas. Although their names appear on the outside of the building in a photograph taken at some undisclosed date, it is not at all clear that either Cunningham or Wood ever practiced at that address or that either

was a part of Addison Legal Services during the period here involved. Their names do not appear on the stationery.

With reference to the Freston-Ascher-Kaczmarek-Alloy real estate transaction which culminated in the undisclosed lawsuit, petitioner testified that Mr. and Mrs. Freston had moved to Florida and wanted to sell a tract of real estate known as Lot 4, and that on September 16, 1977, Winfried Kaczmarek entered into a contract with the Frestons to buy Lot 4. (The September 16, 1977, "contract" in the record, however, is one on which only one signature appears: Winfried Kaczmarek. The record does contain a contract bearing the signatures of Mr. and Mrs. Freston and Winfried Kaczmarek for the sale of Lot 4 to Kaczmarek for $100,000. That contract is dated April 22, 1978, which, we note, was four days after petitioner had contracted to sell Lot 4 to Alloy for $120,000.)

Petitioner further testified that in December Mr. Freston suggested they change to an "installment sale" secured by a mortgage on Lot 4 to the Frestons; that Mr. Kaczmarek accepted the new terms which were "$25,000 down and $25,000 over a three-year period in annual installments" with a $75,000 mortgage on Lot 4 as security; that petitioner told Mr. Freston that petitioner "was interested in going with Mr. Kaczmarek into Lot 4 because of our subdivision we were trying to make," and that it might be necessary to transfer the mortgage to another piece of property, to which he said Mr. Freston agreed. Petitioner also testified that he and Kaczmarek were unsuccessful in acquiring other property for the subdivision and decided in January 1978 to sell Lot 4; that in April Thomas Brewer, Sr., one of Alloy Piping's owners, came to the office to have the corporate income tax return prepared; that he was looking for industrial property, and petitioner succeeded in arranging for him the mid-April purchase of approximately two acres adjacent to Lot 4;

that sale was closed in "our office" with the seller and his attorney and Brewer and petitioner present. According to petitioner, Brewer and he then entered into a contract for the purchase by Brewer of Lot 4, petitioner signing that contract as beneficiary of Bank of Lyons Trust No. 1737 although the trust had never had, and never acquired, title to Lot 4. The Freston-Kaczmarek sale of Lot 4 was closed May 22. The closing statement shows a total purchase price of $100,000, with a purchase-money mortgage from the Kaczmareks to the Frestons for $75,000. A $10,000 real estate commission was payable to petitioner's firm. The Kaczmareks' names were signed to the closing statement by Darianzo.

On July 6, petitioner testified, the Ascher-Alloy sale of Lot 4 was closed. Petitioner said Brewer had "been made aware that the property was encumbered with a $75,000 mortgage"; that Brewer was concerned about his title and was told by petitioner that all incumbrances would be removed "relatively soon"; that Brewer wanted to know "what his title opinion was going to look like," and that petitioner took an old title opinion from the Kaczmarek-Preston closing, masked out with a piece of paper the reference to the mortgage on page 1 and ran it through a copier, changed the amount of insurance from $100,000 to $120,000 and showed it to Brewer as illustrating the policy which would be issued to Brewer. Petitioner testified that he eliminated the mortgage from the first page, but that it was also referred to on the later pages; he also stated that he, Brewer and Darianzo were present when this was done; that Brewer was very much concerned about the mortgage and that petitioner promised to clear the title, but that there was no written agreement to that effect. Petitioner stated he prepared the closing statement, affidavit of title, and the deed; that he felt qualified to do so because he had a 50/50 interest with Kaczmarek. He had the executed deed sent to the recorder's office, and it

reached that office. He left for Europe at the end of July with his family and stayed five weeks. When he returned, the Brewers were upset. They had not received the deed, had employed counsel, gone to the title company office, found the Kaczmareks still had title, and the mortgage was still on the land, even though they had paid the full purchase price to petitioner on July 6. Petitioner testified he was ready to pay off the mortgage in the fall, but that Mr. Freston did not want the money until the following January, and that it was paid and the mortgage released in January 1979. Petitioner also testified that at some time after the filing of the Alloy lawsuit in November 1978 he prepared a written power of attorney from the Kaczmareks to him. That power of attorney pertained to the Lot 4 property, indicated petitioner had an interest in the property, and gave him blanket authority to act for the Kaczmareks. That document was backdated to November 25, 1977, and was acknowledged before a notary on April 9, 1979.

Petitioner also testified that he did not list the pending Alloy lawsuit in his additional questionnaire dated April 16, 1979, because he thought it was listed in his application to take the bar examination for the third time, which he filed in November 1978. Those applications, however, contained no questions regarding court actions involving applicants. Only the character and fitness questionnaire inquired as to court actions, and petitioner had filed it in November 1977, a year before the lawsuit in question had been initiated.

Under questioning by Committee members petitioner stated his position regarding his fiduciary relationship with Alloy and its owners was that such relationship embraced only the tax return. In closing the sale between Kaczmareks and Alloy, petitioner stated Brewer was not represented but closed the transaction "on his own"; that petitioner signed the Kaczmareks' names to the closing

statement although he "was not sure" Brewer knew that. "John Darianzo was there representing Mr. Kaczmarek's interest ***." Even though petitioner owned a 50% interest, he did not sign the closing statement in his own name. When asked "why," he replied, "Because the deed had come from Kaczmareks' to Brewer and I felt I didn't want to mess up my interest by having it go any further." He maintained, however, that Brewer knew of his interest. He admitted that he had signed the Kaczmareks' names to the deed, and that Darianzo had notarized it, and that Darianzo had signed Mr. Kaczmarek's name to the "plat act affidavit" and notarized that, too. He attempted to explain the absence from the closing statement of any reference to the mortgage by saying he had promised Brewer to remove the mortgage "and that's why I didn't put it on the closing statement." Petitioner admitted there were no efforts made to remove or transfer the mortgage from the property being purchased by Brewer between the time Brewer signed the contract in April and the July 6 closing date. There was no discussion with Brewer of the possibility of his company buying the property subject to the mortgage.

In the questioning of petitioner by committee members it also developed that in at least one other real estate transaction (Bernacki) petitioner and Kaczmarek were the actual buyers although petitioner and Darianzo were shown as such. A $10,000 real estate commission was charged the seller there as well as in the Freston sale, a practice petitioner thought proper as long as the parties didn't object. It was also established that petitioner had signed the Kaczmareks' names to an affidavit of title on which a secretary in petitioner's accounting office had executed the jurat. His explanation for the various irregularities was that they were trying "to save paperwork" and took "too many shortcuts."

John Darianzo testified he had been admitted to prac-

tice about 5 years, 2½ of which were spent in Kane County and the balance in Du Page County, all as a sole practitioner. He rented space from petitioner and did some work for him for which he received credit on the rent. He and petitioner formed Addison Legal Services because Darianzo wanted to move to Houston as soon as petitioner was admitted to the bar; "we knew we were going to get Phil Wood and Jack Cunningham in there to take over some of the stuff," and "we wanted to keep it as open as possible." Darianzo admitted he signed the names of Winfried Kaczmarek and Mildred Kaczmarek to a corrective trust deed and Winfried Kaczmarek's name to a "plat act affidavit" with only oral authority from Mr. Kaczmarek and without talking to Mrs. Kaczmarek, whom he did not know but who was ill, and that he then notarized the affidavit himself. He also testified that Brewer was informed of the mortgage on the Freston property and that it would be removed; that Brewer knew of the alterations in the title policy documents; and that the mortgage reference was blocked out and the amount increased so that Brewer could see what the title was "going to look like when I get it back." He thought a secretary might have made the changes—"I don't recall." He excused the absence of a written power of attorney and signing the Kaczmareks' names without noting his agency on the grounds that the Kaczmareks lived in Rockford, some distance away. The fact that he had signed the Kaczmareks' names was not disclosed to Brewer. He conceded his actions were "a little bit improper," but he was "trying to expedite the matter." The fact that he was shown, on the closing statement prepared by him, as one of the buyers in the Bernacki real estate transaction in which he actually had no interest was "inadvertent"; he could not recall why he was shown as the seller in the closing statement prepared by him in the Sollitt real estate transfer when he had no interest in it. He agreed that his

listing as "of counsel" on the Addison Legal Services stationery implied the presence of other lawyers although there were none, but denied this was done to convey the impression that petitioner was a licensed attorney. According to Darianzo, petitioner's responsibilities in connection with Addison Legal Services were those of a landlord, but that petitioner also handled the billing and collection of the fees for legal services. Checks on Darianzo's business accounts had to be signed by any two of Darianzo, his secretary, petitioner or petitioner's wife.

Winfried Kaczmarek testified he had known petitioner six to eight years; that they had been and were in several real estate and business ventures together; that he had given him verbal authority to sign any necessary papers and take any necessary action in connection with any of their transactions; that he had never had any occasion to question petitioner's handling of his money, and that "As far as I am concerned, if he [petitioner] wants some money from me right now, he has got it."

Mrs. Bernacki testified that she had no complaints regarding petitioner and related her efforts to persuade the Frestons, whom she knew well, that petitioner, whom she had recommended to them, was reliable and that they need not worry about the mortgage regarding which they were receiving calls from Brewer.

Thomas Brewer, Sr., testified that he had asked petitioner about Lot 4, which was offered to them by another realtor; that petitioner said he controlled it and "could sell it to us direct" at a cash price of $120,000; and that a contract for its purchase was subsequently signed. During the first part of July the witness went to petitioner's office with a check for the property which he gave petitioner. The witness wanted to take the deed to have it recorded, but petitioner said he preferred to do it. There was no mention of any mortgage until July 28 when he received a letter from the bank which had taken title as trustee for

him. He had received a title commitment at the closing, but there was no change made in it that he knew about, and he did not know until after talking to the bank that a mortgage reference in the title commitment given him had been blocked out. John Darianzo had been sitting at his desk on the other side of the room while the witness dealt with petitioner. On other occasions when the witness had purchased real estate he had retained a lawyer, but he assumed petitioner was one. All of the sellers' signatures on the document had been affixed before the witness arrived. Brewer was asked about an October 19, 1978, letter to petitioner which referred to "clear title" being promised on July 6 and three specified September and October dates. That reference was explained as resulting from the witness' efforts to get a closing date set and petitioner's indication that he would have it "all complete" on the 6th. Brewer again asserted that there was no disclosure of the mortgage or discussion about it until after the July 28 notice from the trustee bank. He stated that he no longer had any faith at all in petitioner.

The final witness before the Committee was Bruce Heidecke, a lawyer who represented the Frestons in their sale to Kaczmarek. He testified that at no time during that transaction did he or his clients know that petitioner was a partner with Kaczmarek. He also testified to participating in a December 20, 1977, real estate closing in which petitioner appeared. The witness represented the seller, and petitioner, who was not the broker in the sale, appeared to represent the Garzas, who were buying the property. Petitioner, Heidecke testified, took all of the documents tendered by Heidecke, examined them and explained their significance to the Garzas. Although petitioner did not so state, the witness assumed petitioner to be the Garzas' lawyer. Petitioner subsequently filed an affidavit stating he attended the closing solely as a broker and friend of the Garzas. The affidavit does not

indicate petitioner to have acted as a broker in that sale; it does state petitioner did not charge a fee and did not represent himself to be a lawyer.

A number of letters and statements from clients, friends and community residents, including a Lewis University professor, were filed attesting to petitioner's honesty and competency.

The Committee filed with the Board a unanimous report reciting the evidence and stating certain conclusions. Petitioner's conduct was found to be "inexcusable," and the report indicated the Committee could "not accept" petitioner's explanation of his failure to disclose the Alloy Piping litigation. The Committee found "unconscionable" the procedures followed by petitioner, particularly with reference to the Alloy and Freston transactions, indicating to the Committee "a serious defect in the character of the applicant, rendering him unfit to practice law in Illinois." A further reason for denying certification was found by the Committee in its belief that "the procedure followed with respect to the 'Addison Legal Service' was simply a subterfuge to permit Ascher to practice law without a license."

It is well established that the exercise of discretion by a committee on character and fitness in its consideration of an applicant's fitness for admission to practice law in this State will not be reversed by this court unless certification has been arbitrarily refused. (See *In re Latimer*, (1957), 11 Ill. 2d 327, 330, *appeal dismissed* (1957), 355 U.S. 82, 2 L. Ed. 2d 111, 78 S. Ct. 153; *In re Frank* (1920), 293 Ill. 263, 264; see also Sprecher, *Admission to Practice Law in Illinois*, 46 Ill. L. Rev. 811, 835 (1952).) It is, moreover, clear that the burden of proving the requisite good moral character and fitness lies on the applicant. See *In re Martin-Trigona* (1973), 55 Ill. 2d 301, 305, *cert. denied* (1974), 415 U.S. 910, 39 L. Ed. 2d 465, 94 S. Ct. 1404; see also, Weiss, *The Commit-*

*tee on Character and Fitness: The Supreme Court's Private Investigators!,* 45 Ill. Bar J. 818, 822 (1957). Recent decisions of this court have emphasized the importance of an applicant's duty to respond fully and accurately to those questions posed in an application for admission to the bar. (See *In re Mitan* (1979), 75 Ill. 2d 118, 127, *cert. denied* (1979), 444 U.S. 916, 62 L. Ed. 2d 171, 100 S. Ct. 231; *In re Martin-Trigona* (1973), 55 Ill. 2d 301, 307, *cert. denied* (1974), 415 U.S. 910, 39 L. Ed. 2d 465, 94 S. Ct. 1404; see also Illinois Code of Professional Responsibility, Disciplinary Rule 1–101(A) (1970); Committee on Professional Responsibility, Proposed Draft, Disciplinary Rule 1–101(A) (1980).) Other jurisdictions have similarly stressed the requirements imposed by this duty on bar applicants. In *In re Willis,* 288 N.C. 1, 18, 215 S.E.2d 771, 781, *appeal dismissed* (1975), 423 U.S. 976, 46 L. Ed. 2d 300, 96 S. Ct. 389, the North Carolina Supreme Court stated: "Misrepresentations and evasive or misleading responses, which could obstruct full investigation into the moral character of a Bar applicant, are inconsistent with the truthfulness and candor required of a practicing attorney," citing, *Carver v. Clephane* (D.C. 1943), 137 F.2d 685, *In re Meyerson* (1948), 190 Md. 671, 59 A.2d 489, *In re Greenblatt* (1938), 253 App. Div. 391, 2 N.Y.S.2d 569, and Annot., *Admission to Bar—Moral Character,* 64 A.L.R.2d 301, 318 (1959).

Because committees on character and fitness lack the personnel and other resources to conduct independent investigations of bar applications, they are obliged to rely primarily on truthful answers by the applicants to committee questionnaires as a source of material information. Failure to answer truthfully and fully has been held tantamount to a fraud upon this court and has resulted in the imposition of severe disciplinary measures. *In re Mitan* (1979), 75 Ill. 2d 118, 127, *cert. denied* (1979),

444 U.S. 916, 62 L. Ed. 2d 171, 100 S. Ct. 231, citing *People ex rel. Healy v. Propper* (1906), 220 Ill. 455, *People ex rel. Deneen v. Gilmore* (1905), 214 Ill. 569, and *People ex rel. Deneen v. Hahn* (1902), 197 Ill. 137.

When requested to list on his original questionnaire any action or legal proceeding, civil or criminal, in which he had been a party or otherwise involved, petitioner listed eight actions in which he was apparently a party and an unspecified number of traffic violations. When requested to update that list in a supplemental questionnaire, petitioner failed to indicate that Alloy had filed a suit against him by responding that there had been "no change" since the filing of his original statement. Petitioner has attempted to explain this false response by claiming that he believed the lawsuit had been reported on an earlier form. The Committee obviously did not believe that explanation, and the members' disbelief certainly cannot be said to be contrary to the manifest weight of the evidence. The creditability of petitioner's explanation is further strained by the fact that he stated in his sworn petition filed with this court that the Alloy suit "wasn't of such legal and ethical concern that it would inevitably impress one's consciousness, to the necessity of suppression." This assertion that the charges of forgery and fraud contained in the complaint filed by Alloy were not such as to cause serious concern regarding petitioner's moral character simply emphasizes petitioner's insensitivity to the improprieties and irregularities evidenced by his earlier conduct. Like the record in this case, petitioner's explanation demonstrates the existence of fundamental questions regarding petitioner's capacity to make those ethical judgments required of an attorney in the course of his practice and the performance of his fiduciary responsibilities. We can conclude only that the Committee's refusal to certify petitioner is not contrary to the manifest weight of the evidence. Indeed, it seems to us

the only conclusion a conscientious committee could reach.

If, however, further proof of unfitness were thought to be necessary, it is readily available in the fact that petitioner not only knew Darianzo had signed the Kaczmareks' names to the mortgage, but, incredibly, Darianzo had also signed Mr. Kaczmarek's name to the title affidavit, notarizing it as well; additionally, petitioner himself had signed the Kaczmareks' names to a deed and affidavit and had his secretary execute the jurat. Leaving aside the matter of the deeds, the gross impropriety in the execution and notarization of the affidavits is obvious even to the untrained mind. In neither case, apparently, was this procedure known to the other concerned parties.

During oral argument of this case, counsel for the Committee noted two other misrepresentations in petitioner's supplemental statement. When asked whether he had ever worked in a law office or had otherwise been employed by a lawyer, petitioner answered "no," in the original questionnaire, and "no change," on the supplemental statement. He did so despite the fact he was the registered owner of Addison Legal Services and had been serving as its business manager. In addition, he had answered "no" on both forms to the question whether he had ever been "accused by any employer, superior, associate, customer or other person of dishonesty in connection with any employment or occupation," even though the Alloy suit charged him with gross misconduct including fraud and forgery.

Petitioner has repeatedly asserted in oral argument and in his briefs that Alloy has received what it paid for as though the belated payment and release of the mortgage completely eliminated all problems. True, Alloy apparently has, several months after filing a lawsuit to compel it, received the clear title to Lot 4 for which it paid some six months earlier. But the character and fitness require-

ments of the legal profession are not met simply by ultimately delivering that which was wrongfully withheld originally. The integrity of our profession can be no greater than that of its members, and we protect neither our profession nor the public when we admit to the profession those who have demonstrated the insensitivity to its standards which is evident here.

The petition for admission to the bar of this State is denied.

*Petition denied.*