*In re* MICHAEL CREIGHTON GLENVILLE,
Petitioner.

*Opinion filed November 30, 1990.*

· STAMOS, J., specially concurring.

Edward J. Bradley, Sr., of Bradley & Bradley, of Chicago, for the Committee on Character and Fitness.

Raymond P. Carroll, of Chicago, for petitioner.

CHIEF JUSTICE MORAN delivered the opinion of the court:

Petitioner, Michael Creighton Glenville, was graduated from IIT Chicago-Kent College of Law in June 1985 and passed the Illinois bar examination in July 1985. Following an investigation, the Committee on Character and Fitness (Committee) refused to certify to the State Board of Law Examiners that petitioner possessed the good moral character and general fitness necessary for the practice of law. Petitioner requested a hearing on that decision and, on October 17, 1988, and November 15, 1988, the hearing panel of the Committee received evidence concerning his character and fitness to practice law. The panel initially voted 4 to 3 to recommend certification, but one member of the panel changed his vote. As a result, the full Committee directed the panel to reconvene and, on January 22, 1990, the panel voted 5 to 2 to deny certification. Petitioner filed exceptions to the report and recommendation of the hearing panel (107 Ill. 2d R. 708(d)).

The following issues are raised on review: (1) whether the hearing panel arbitrarily disregarded petitioner's evidence that he suffered an alcohol-related blackout on March 28, 1984; and (2) whether the hearing panel's recommendation to deny certification was arbitrary.

The following evidence was adduced at petitioner's hearing. He was born in 1944 and has resided in Chicago and its surrounding communities his entire life. Petitioner testified that he began drinking alcohol at the age of 14. He stated that while he had used marijuana and cocaine sometimes in the past, he preferred alcohol.

Petitioner had engaged in a series of criminal acts, beginning in December 1958, when he was arrested with

four high school classmates for riding in a stolen motor vehicle. He pleaded guilty in juvenile court and was sentenced to one year of supervision. In May 1964, petitioner was arrested as a result of a barroom altercation. He pleaded guilty to disorderly conduct, was fined $250 and served two days in jail. In March 1974, he pleaded guilty to the offense of driving under the influence of alcohol. He was fined $500 and his driver's license was revoked for one year. In November 1977, petitioner refused to take a breathalyzer test and his driver's license was revoked for 90 days because of his refusal to take the test.

In 1978, petitioner began working as a hearing officer with the Cook County assessor's office. In his employment application, petitioner included one prior position which he never held and failed to include any of his prior arrests. In 1981, petitioner entered the evening program at IIT Chicago-Kent College of Law. In his application for admission, petitioner included one prior position which he never held and failed to include his job as a bouncer in a bar.

In 1982, petitioner entered the Chicago police academy and was graduated first in his class. As a policeman, petitioner received five honorable mentions. Five or six complaints were made against petitioner but none of them were sustained.

The following incident took place on March 27, 1984, and March 28, 1984, while petitioner was on furlough from the Chicago police department. At approximately 11:30 p.m. on March 27, 1984, petitioner went to the Snuggery Lounge in Chicago. In the course of three to four hours, petitioner drank five or six Southern Comfort Manhattans which, according to the record, contained two to three ounces of alcohol per drink. Throughout the evening, petitioner was accompanied by Mr. Hall and Mr. Terry Finnegan. Petitioner knew Hall

from the Rush Street area but he had never met Finnegan before.

At approximately 1:30 a.m., a prostitute, Brenda Yearby, solicited petitioner for an act of sex and informed him that he could meet her at the Paxton Hotel in Chicago. He told her that he was a policeman and suggested that she leave the bar. Yearby, however, remained there with her companion, Rufus Terry. Petitioner left to use the washroom; when he returned he noticed that his drink tasted bitter. He testified that he experienced a complete blackout which lasted 14 to 16 hours. There is no medical evidence in the record which indicates that petitioner's blackout was drug-induced. He maintains that the blackout was caused by his addiction to alcohol and his overconsumption of alcohol that evening.

The record reveals that Yearby and Terry carried an attache case containing 1,000 $1 bills and an additional $140. At some point during the evening Terry opened the case in the lounge. Petitioner did not see the attache case in the lounge. According to him, Finnegan saw the case and he told petitioner that the case contained little bags of white powder.

At approximately 4:30 a.m., petitioner and his two companions left the lounge and went to the Paxton Hotel. The hotel clerk, Charles Carner, testified that petitioner "staggered through the door" and appeared drunk. Petitioner showed Carner his badge and told him that he was on a "drug investigation." He demanded Yearby's room key, but Carner refused to give it to him. Carner testified that petitioner became extremely abusive, used profane language and threatened him with his pistol. Carner relented and brought petitioner to Yearby's room. On the way to the room petitioner kicked and beat Carner and threatened him further with his pistol. Carner gave petitioner the room key, but petitioner was

not able to unlock the door. Petitioner then fired one shot into the ceiling, one into the door, and he used his body to open the door and found Yearby in the room. He placed his pistol against Yearby's head and asked her where Terry was. He found Terry naked in the closet and ordered him to lie on the bed. After a search of the room, petitioner found the attache case under some clothing. The case was opened; it contained the money but not the drugs. Petitioner then attempted to telephone the police, but he was unable to get through because no one was tending the hotel switchboard. Petitioner confiscated the attache case and left the hotel.

Yearby and Terry called the 911 emergency number. Chicago police officer Michael Williamson responded quickly to the call and conducted a brief investigation at the hotel. Officer Williamson then proceeded immediately to petitioner's apartment. Officer Williamson confronted petitioner outside his apartment and asked petitioner what he had been doing. Petitioner stated he was out having a good time and that he was on his way to Cicero. Petitioner was placed under arrest and 255 one dollar bills were found in the dresser drawer of petitioner's apartment.

After he made bond, petitioner was voluntarily committed to Ingalls Memorial Hospital for detoxification. He was then transferred to Northwestern Memorial Hospital, where he remained for two weeks. Petitioner testified that he was suicidal for several days following the incident.

Petitioner was charged with home invasion, armed robbery, residential burglary, armed violence and theft. After a bench trial, petitioner was found guilty of the misdemeanor offense of theft in an amount less than $300, and was sentenced to one year of conditional discharge. Petitioner was acquitted of the remaining charges. The court found that petitioner did not possess

the mental state element of those offenses because he thought he was acting in the line of duty. In support of that finding, the court noted that petitioner's intellectual ability was substantially reduced as a result of his over-consumption of alcohol. The appellate court affirmed the judgment of the trial court. 144 Ill. App. 3d 1175 (unpublished order under Supreme Court Rule 23).

After an administrative hearing, petitioner was discharged from the Chicago police department. That decision was upheld by the circuit court and appellate court. (177 Ill. App. 3d 583.) Petitioner maintains that he did not receive a fair hearing because the police board did not consider whether the incident was causally related to his addiction to alcohol.

Petitioner testified that his criminal or violent behavior always occurred when he was under the influence of alcohol, and he was never in any kind of trouble when he was not under the influence of alcohol. He stated that he had suffered blackouts in the past as a result of his over-consumption of alcohol, but never of the magnitude of March 28, 1984.

Petitioner testified that he began attending Alcoholics Anonymous (AA) meetings once he was released from the hospital. He stated that he attends AA meetings three times per week, has chaired meetings, has served as a secretary, and has sponsored two persons. He further stated that all of his friends are AA members and he regularly attends AA social functions.

Petitioner testified that he has not consumed any alcohol or taken any mood-altering drugs since March 28, 1984. He admits that he is an alcoholic and is "powerless over all of the mind and mood altering drugs." He testified that he is confident that he will not drink alcohol or take drugs again. Finally, petitioner apologized for what he had done.

Petitioner's sister, Carol Ryan, testified on petitioner's behalf. She stated that their mother passed away in August 1983, and at that point petitioner began drinking more heavily. She further stated that petitioner became violent when he was under the influence of alcohol, but was a "kind, considerate" person when sober.

Ryan testified that she, like petitioner, is a recovering alcoholic. She stated that, based on her relationship with her brother and her experience as a member of AA, she is confident that petitioner will never drink alcohol again. She testified that she has not seen petitioner drink alcohol since March 28, 1984.

Five friends of petitioner who are members of AA also testified on petitioner's behalf. They stated that petitioner has often expressed regret over the incident of March 28, 1984. They further stated that, based on petitioner's personality, desire and active involvement in AA, they do not believe petitioner will ever drink alcohol again.

The five members of AA further testified that they each suffered blackouts in the past as a result of the overconsumption of alcohol, and that they each did things while under the influence of alcohol that they later regretted. They expressed the opinion that alcoholics frequently suffer blackouts.

Dr. Jack Arbit, a clinical psychologist, interviewed petitioner, examined his history and gave him a series of neuropsychological and personality tests. Dr. Arbit opined that petitioner suffered from "alcohol dependence and chronic anxiety reaction." He noted that petitioner is deeply committed to AA and to reorganizing his life. He believed that petitioner has the ability to abstain from alcohol and to overcome the stresses and demands of life and the practice of law.

Dr. Arbit testified that blackouts typically occur as a result of the overconsumption of alcohol. He further testified that alcoholics suffer blackouts more frequently

during the later stages of their addiction. It was his opinion that petitioner suffered a blackout on March 28, 1984, and that the incident on that date was causally related to petitioner's history of alcoholism and overconsumption of alcohol that evening.

Mary Larsen, a senior certified addictions counselor, met with petitioner on several occasions and reviewed his history. Larsen testified that petitioner was "just one of millions" who have performed violent or immoral acts while under the influence of alcohol. She stated that, in her experience, a large percentage of alcoholics suffer blackouts. She further stated that a large percentage of police officers who have undergone treatment for alcoholism have used their weapons when it was inappropriate to do so. Larsen concluded that petitioner is dedicated to abstinence and is taking the correct steps to remain sober. She opined that petitioner is not capable of performing bad or violent acts when he is not under the influence of alcohol.

The first issue presented for review is whether the hearing panel arbitrarily disregarded petitioner's evidence that he suffered an alcohol-related blackout on March 28, 1984. The hearing panel heard a great deal of evidence on the subject of alcohol-related blackouts. The evidence was comprised of the testimony of petitioner and the testimony of petitioner's lay and expert witnesses. Nonetheless, "[c]ertain members of the hearing panel experienced doubts as to the possibility that a 'black out' does occur as a result of the excessive consumption of alcohol."

Petitioner presented two expert witnesses who testified that it is possible for someone to suffer a blackout as a result of the overconsumption of alcohol. In fact, both experts testified that blackouts are a common problem for alcoholics. There was no expert testimony to the contrary.

The weight accorded expert testimony must be decided by the trier of fact. (*Miller v. Pillsbury Co.* (1965), 33 Ill. 2d 514, 516.) Even if several competent experts concur in their opinion and no opposing expert testimony is offered, it is still within the province of the trier of fact to weigh the credibility of the expert evidence and to decide the issue. (*People v. Harvey* (1919), 286 Ill. 593, 604.) However, the uncontradicted and unimpeached opinion of an expert cannot be rejected arbitrarily. (R. Hunter, Trial Handbook for Illinois Lawyers, Civil, §45.16, at 573 (6th ed. 1989); 31A Am. Jur. 2d *Expert & Opinion Evidence* §135 (1989).) An opinion of an expert is to be accorded such weight that, in light of all of the facts and circumstances of the case, reasonably attaches to it. *Harvey*, 286 Ill. at 604.

The Committee report and the record amply demonstrate to this court that the expert testimony on alcohol-related blackouts was not arbitrarily disregarded. In their concluding remarks of their report, the Committee noted that "[c]ertain members experienced doubts as to the possibility that a 'black out' does occur as a result of the excessive consumption of alcohol." A doubt is simply an inclination to disbelieve. (Webster's Third New International Dictionary 679 (1986).) Disbelieving expert testimony does not mean that the testimony was arbitrarily rejected.

In addition, the record of the hearing before the Committee demonstrates that the Committee did not simply reject the testimony on alcohol-related blackouts in an arbitrary fashion. In fact, Committee member Robert F. Martwick expressed interest in blackout episodes and therefore asked petitioner's expert, Dr. Jack Arbit, about the behavior of persons who are in an alcohol-related blackout state. The other expert who testified on behalf of the petitioner, Mary Larsen, was asked questions about alcohol-related blackouts by the attorney

representing the Committee, Edward Bradley, as well as Committee members Henry Field, Ronald Orner, and the Committee chairman, William Maddux.

The second issue presented for review is whether the hearing panel's recommendation to deny certification was arbitrary. Petitioner bears the burden of proving that he possesses the good moral character and general fitness necessary for the practice of law. (*In re DeBartolo* (1986), 111 Ill. 2d 1, 5.) When a hearing panel concludes that a petitioner does not possess the good moral character and general fitness necessary for the practice of law and recommends to deny certification, the court will not reverse unless that recommendation was arbitrary. *In re Ascher* (1980), 81 Ill. 2d 485, 498; *In re Latimer* (1957), 11 Ill. 2d 327, 330; *In re Frank* (1920), 293 Ill. 263, 264; but see *In re Loss* (1987), 119 Ill. 2d 186, 193-94 (when the Committee recommends to certify the applicant, the court will not reverse unless the record shows by clear and convincing evidence that petitioner is neither rehabilitated nor fit to practice law).

It is apparent from the Committee's report and from the record of the hearing before the Committee that the Committee considered the totality of the petitioner's background, including his rehabilitation efforts since the incident of March 28, 1984, before concluding that petitioner did not possess the good moral character and general fitness necessary for the practice of law. The record is replete with information about petitioner which supports the Committee's determination that petitioner does not possess the requisite character to practice law. Therefore, we hold that the Committee's recommendation to deny certification was not arbitrary.

The Committee deemed the petitioner's arrest record to be significant. At the age of 14, in 1958, petitioner was arrested for riding in a stolen motor vehicle. He pleaded guilty to this offense in juvenile court and he

was given one year's supervision. At the age of 19, in 1964, petitioner pleaded guilty to a disorderly conduct charge which stemmed from a barroom altercation. Also, in a separate incident in 1964, petitioner was again arrested on a disorderly conduct charge. This charge stemmed from an argument petitioner had with a prostitute. Petitioner was acquitted.

In 1972, petitioner was arrested as a result of a fight at a wedding reception. Petitioner was acquitted of this charge. In 1974, petitioner was arrested on a battery warrant which was issued as a result of petitioner's conduct in evicting a patron from a tavern. Petitioner was acquitted of this charge also.

Petitioner was charged with driving while intoxicated in 1974 and 1977. In 1974, he pleaded guilty to this offense and his driving privileges were revoked for one year. In 1977, he was found not guilty of driving while intoxicated, but his driving privileges were suspended for 90 days because he refused to take a breathalyzer test.

The Committee considered petitioner's conduct on March 27 and 28, 1984, to be the most significant factor which impacted upon his character and fitness. The petitioner was not able to testify about most of the events that transpired during the March 1984 incident, because he claimed at the hearing that much of the incident occurred while he was in an alcoholic-blackout state. Therefore, the hearing panel had to rely to a large extent on stipulations, and transcripts of the cause before the police board and the criminal division of the circuit court of Cook County.

We can understand why the Committee attached so much significance to the March 1984 incident because the testimony of petitioner and the circumstances surrounding the incident cast some doubt on petitioner's veracity. Since he cannot recall because of the blackout, petitioner's only explanation for his going to the Paxton Hotel

was that he led a drunken police raid to confiscate drugs that were allegedly in the possession of Yearby and Terry. Petitioner embarked on this raid because a person whom he never met before, Finnegan, told him that a briefcase in the possession of Yearby and Terry contained little bags of white powder. However, Yearby had testified previously in petitioner's criminal trial that the briefcase contained a significant amount of money and it was opened up in petitioner's presence at the Snuggery. At the hearing before the Committee, petitioner claimed he never saw the briefcase or its contents. Yet, one of the undisputed events noted in the appellate opinion which reviewed the discharge order of the police board was that petitioner "tried to take the briefcase but Yearby stopped him." 177 Ill. App. 3d at 584.

As it turned out, when petitioner arrived at the hotel, the briefcase did not contain the little bags of white powder that he was searching for. The briefcase contained over $1,000 in cash instead. The hotel clerk testified at the hearing that petitioner attempted to phone the police from the hotel but that he was unsuccessful because the telephone switchboard was unattended. This would support petitioner's explanation that he was engaged in a drunken police raid. However, the very people he attempted to reach by phone, the Chicago police, met him outside his apartment almost immediately after the incident. Petitioner was questioned by Officer Michael Williamson outside his apartment. Officer Williamson asked petitioner what he had been doing that night. The petitioner did not say that he had confiscated money in a raid. Rather, petitioner stated that he was out having a good time and that he was on his way to Cicero. Petitioner's reply to Officer Williamson casts some doubt on the truthfulness of his explanation to the Committee that he was engaged in a drunken police raid.

There are additional reasons why petitioner's credibility in connection with his testimony regarding the March 1984 incident is somewhat doubtful. First, petitioner, while testifying before the hearing panel, stated he did not take drugs on the night of March 27, 1984. Yet, petitioner's defense at trial was predicated on drug intoxication, and one of petitioner's witnesses testified that petitioner was under the influence of drugs when the witness saw the petitioner the morning of March 28.

The second reason relates to petitioner's testimony that he suffered an alcohol-related blackout in March 1984. Petitioner was ultimately convicted of misdemeanor theft. (Ill. Rev. Stat. 1989, ch. 38, par. 16—1(b)(1).) Under the Criminal Code of 1961 (Code), a theft must be committed "knowingly." (Ill. Rev. Stat. 1989, ch. 38, par. 16—1(a).) The Code states that persons act knowingly when they are consciously aware that their conduct or the attendant circumstances of their conduct will lead to one of the Code's defined crimes, or when they are practically certain such a result will occur. (Ill. Rev. Stat. 1989, ch. 38, par. 4—5.) Petitioner was convicted of a crime which requires conscious awareness of his behavior, or at least practical certainty that his behavior will achieve a particular result. We find his theft conviction to be logically inconsistent with the concept of an alcohol-related blackout. How could petitioner be consciously aware of his behavior on March 27, 1984, and perform the acts which consisted of the other elements of the crime of which he was eventually convicted, and yet be in a blackout state? We believe this inconsistency can only weigh against petitioner, in light of the other more obvious examples of petitioner's untruthfulness.

Honesty is an important factor in assessing a person's moral character. (*In re Polito* (1989), 132 Ill. 2d 294, 303.) Petitioner did answer his bar application completely and honestly. (See *In re Mitan* (1979), 75 Ill. 2d

118 (attorney disbarred when it was discovered that he lied on his bar application).) However, petitioner lied on his application to law school. He failed to list a previous job and listed one prior position which he had not occupied. Petitioner testified that he intentionally falsified this information in order to "be seen in a better light." Moreover, petitioner had been in continual violation of City of Chicago weapons registration laws, both while he was a policeman and since his dismissal from the police department.

On the subject of petitioner's alcoholism, it is clear from the record that he has overcome this problem. He attends AA meetings three times per week, he has held leadership positions within AA and he is generally an active participant in the organization. Petitioner states that he has dedicated his life to abstinence. As an example of his determination, he abstained from alcohol despite the trauma of his father's death in 1985. He is to be commended for his fortitude. While the petitioner may be rehabilitated, rehabilitation is only one factor, albeit an important one. (*In re Loss* (1987), 119 Ill. 2d 186, 196.) The Committee adequately considered petitioner's rehabilitation before it decided to deny certification. Petitioner's past misconduct cannot be lessened by his subsequent exemplary conduct. *In re Berkley* (1983), 96 Ill. 2d 404, 410.

For the reasons stated, the petition for admission is denied.

*Petition denied.*

JUSTICE STAMOS, specially concurring:

I agree with the majority's denial of the petition in the case at bar. However, I find, in some respects, the majority fails to squarely face the issues presented in this case. I therefore write separately.

Supreme Court Rule 708 provides that an applicant "who has availed himself of his full hearing rights before the Committee on Character and Fitness and who deems himself aggrieved by the determination of the committee may *** petition the Supreme Court for relief." (107 Ill. 2d R. 708(d).) Generally, an exercise of discretion by the Committee on Character and Fitness (Committee) in its consideration of an applicant's fitness for admission to the bar will not be reversed by this court unless certification has been arbitrarily refused. (*In re Ascher* (1980), 81 Ill. 2d 485, 498.) The Committee's determinations are advisory only, and neither bind this court nor limit our authority to take action. *In re Loss* (1987), 119 Ill. 2d 186, 192.

The Committee's report and the majority opinion focus almost exclusively on the incident of March 27, 1984. Because of the outrageous nature of this incident, the Committee was forced to focus most of its efforts on petitioner's past in connection with both the particular incident in question and petitioner's history of alcoholism. After examining the Committee's report, I have determined that petitioner's testimony before the Committee about this incident, in light of the events and results of his trial for the criminal acts he allegedly committed that evening, raises some questions regarding petitioner's veracity. I will explain this later. However, even though I agree with the majority that the Committee reached its alleged "findings" regarding the expert testimony relating to alcohol-related blackouts without arbitrarily disregarding petitioner's expert testimony, I believe the majority failed to recognize how unimportant this issue is in relation to the evidence of petitioner's lack of moral character.

There is nothing arbitrary about denying this petition. There is ample evidence in the Committee report, unconnected to the incident of March 27, 1984, or peti-

tioner's alcohol problems, which impugns petitioner's veracity in such a way that I conclude he lacks the requisite moral character for bar admission. Petitioner falsified an application for employment by listing prior jobs he had in fact never occupied while omitting certain jobs and entirely omitting his arrest record. He admitted to the Committee that these falsifications were intentional, stating, "I didn't think I would get the jobs if I had been accurate on the application."

Further, petitioner lied on his application to law school. He failed to list a previous job and listed one prior position which he had not occupied. Again, petitioner testified that he falsified this information in order to "be seen in a better light."

There is nothing in the record that shows petitioner's deceitful nature has any connection to his alcoholism. Rather, the record, particularly petitioner's own testimony, reveals a pattern of using fraud and deceit to further career objectives. The majority opinion fails to clearly articulate this point. Petitioner had argued that the Committee's decision to deny certification was based solely on petitioner's alcohol-inspired violent tendencies. However, the Committee report clearly shows that while much of the focus was on petitioner's alcoholism and alcohol-induced violent behavior, it also considered petitioner's general background and employment history, which revealed petitioner's history of prevarication. Therefore, based solely on petitioner's deceitful tendencies, I would deny certification.

The majority correctly mentions petitioner's rehabilitation from alcoholism. (139 Ill. 2d at 249.) Rehabilitation is indeed important. (*Loss*, 119 Ill. 2d at 196.) Petitioner argues that his case is "markedly different" from the *Loss* case in that the petitioner in *Loss* had a more egregious criminal record and history of dishonesty. However, the same misgivings regarding the *Loss* peti-

tioner are equally applicable to the petitioner in the case at bar. Should we "permit a person to perpetrate a fraud on a law school in order to be admitted, and then later, when applying for admission to the bar, to admit that he had been a liar and be forgiven. To me, being truthful in answering the [Committee] questionnaire is not a manifestation of the reform of a deceitful person." (Loss, 119 Ill. 2d at 214-15 (Ryan, J., specially concurring).) There is nothing in the evidence to show that the Committee found these specific incidents of petitioner's deceitfulness to be connected with or influenced by his drinking. Even if we were to hypothesize that petitioner's lying on the employment and law school applications were attempts at concealing conduct which alcoholism caused to transpire, there is nothing in the record to support this. Petitioner admitted the lies were to put himself in the best possible light. I am not concerned with petitioner's past alcohol abuse, or the violent acts which ensued as a result. Petitioner has apparently overcome this problem; I commend him for his courage and tenacity. I am also not concerned with his criminal record. I am, however, concerned about his propensity for lying. (See Loss, 119 Ill. 2d at 213-14 (Ryan, J., specially concurring).) Therefore, even if the incident of March 27, 1984, had never occurred, the record supports denying this petition.

I also agree with the majority's conclusion regarding how the incident of March 27, 1984, and its legal resolution casts some doubt on petitioner's veracity. Before I explain this, however, I must discuss the ambiguity caused by the majority's failure to exactly define the terms "alcohol-related blackout" (see 139 Ill. 2d at 244) or "complete blackout" (see 139 Ill. 2d at 246). To a lay person, a "blackout" could mean a temporary memory loss or a loss of consciousness. (American Heritage Dictionary 185 (2d College ed. 1985).) The majority never explains this. The Committee report contains summaries

of the expert witnesses' testimony, but is also unclear as to what a person experiences when he or she is "blacked out" due to alcohol consumption. Is it that a "blackout" victim possesses the ability to reason and make willful decisions, and simply cannot remember what he has done? Or does "blackout" mean a complete loss of control, where the ability to reason, make rational or volitional decisions, and remember are all suspended? This lack of clarity could explain why some members of the hearing panel expressed misgivings about the expert testimony.

Indeed, in his arguments before the court, petitioner made much of the hearing panel's "finding" that alcohol-related blackouts cannot occur. While I agree with the majority's conclusion that there was insufficient evidence to show that the panel arbitrarily rejected petitioner's expert testimony, to go no further leaves several questions unanswered.

First, petitioner argues the hearing panel concluded that no blackout had occurred. The majority opinion fails to address this argument. I find that the panel made no such "finding" of fact. The Committee report merely stated that "[c]ertain members of the hearing panel experienced doubts" regarding the factual existence of "blackouts" stemming from the overconsumption of alcohol. The report contains no evidence to connect this statement to the vote taken by the hearing panel. In fact, the Committee report noted that the hearing panel had reviewed all the evidence, including petitioner's police record, transcripts of his hearings before the police board and the trial court, and his general background. The majority opinion merely states that some of the Committee members "expressed interest" in the blackout theory. (139 Ill. 2d at 251.) This begs the question. The majority should have focused on the totality of the

hearing panel's investigation and given more emphasis to the critical issue in this cause—*petitioner's* credibility.

I also find that the majority's discussion of the March 27, 1984, incident and petitioner's conviction following that event does not clearly explain why these circumstances reflect poorly on petitioner's moral character. "An opinion of an expert is to be accorded such weight [as], *in light of all the facts and circumstances of the case,* reasonably attaches to it." (Emphasis added.) (*People v. Harvey* (1919), 286 Ill. 593, 604.) While all the testimony regarding the possibility of alcohol-related blackouts went uncontradicted, the other facts and circumstances relating to petitioner's alleged blackout on March 27, 1984, leads me to conclude that the majority's conclusion that these events cast a pall on petitioner's veracity needs bolstering.

While not conclusive in and of themselves, there are several reasons why petitioner's credibility in connection with his testimony regarding the March 27, 1984, incident is at least somewhat doubtful; the majority touched on most of these. First, petitioner, while testifying before the hearing panel, stated he did not take drugs on the night of March 27; he stated that his blackout was solely alcohol induced. Yet, petitioner's defense at trial was predicated on "drug intoxication," and one of petitioner's witnesses testified that petitioner was under the influence of drugs when the witness saw petitioner the morning of March 28. The record is unclear as to what petitioner's attorney meant by pleading "drug intoxication," and we cannot determine the credibility of the witness' testimony. While certainly not conclusive, this evidence adds to my impression that petitioner has habitually relied on falsehood to avoid the consequences of his past behavior.

The next two reasons relate to assessing whether petitioner's testimony regarding his suffering the blackout

is actually an issue on which our determination of petitioner's character and fitness should rest. When the trial judge acquitted petitioner of most of the charges related to the March 27 incident, the judge stated that petitioner had been acting under the impression that he was performing his police duties. The record is unclear as to whether this holding was based on petitioner's testimony, or simply upon the trial judge's observation or the testimony of others. Also, the trial judge did convict petitioner of misdemeanor theft. (Ill. Rev. Stat. 1983, ch. 38, par. 16—1(b)(1).) Through all this, petitioner maintains he has no memory of the events of the evening of March 27, 1984.

These two determinations of the trial court could be seen as being at odds with what petitioner characterizes as a "complete blackout." Theft was, at common law, a specific-intent crime. (Ill. Ann. Stat., ch. 38, par. 16, Committee Comments, at 18 (Smith-Hurd 1977).) Under the Criminal Code of 1961 (Code), a theft must be committed "knowingly." (Ill. Rev. Stat. 1983, ch. 38, par. 16—1(a).) The Code states that persons act knowingly when they are *consciously aware* that their conduct or the attendant circumstances of their conduct will lead to one of the Code's defined crimes, or when they are practically certain such a result will occur. (Ill. Rev. Stat. 1989, ch. 38, par. 4—5.) For petitioner's intoxication to have negated his criminal responsibility on March 27, 1984, it must have been so extreme as to nullify the existence of a mental state which is an element of the crime. (Ill. Rev. Stat. 1983, ch. 38, par. 6—3(a); Ill. Rev. Stat. 1989, ch. 38, par. 6—3(a) (1988 amendment states that criminal responsibility is negated if intoxication "[i]s so extreme as to suspend the power of reason and render him incapable of forming a specific intent which is an element of the offense").) Thus, petitioner's intoxication defense could only have been effective if the prose-

cution was unable to prove that petitioner possessed the mental state required for several of the offenses he had been charged with. See O'Neill, *Illinois' Latest Version of the Defense of Voluntary Intoxication: Is it Wise? Is it Constitutional?*, 39 De Paul L. Rev. 15, 19 (1989).

Petitioner was convicted of a crime which requires "conscious awareness" of his behavior, or at least "practical certainty" that his behavior will achieve a particular result. I find this logically inconsistent with the concept of a "complete blackout." How could petitioner be "consciously aware" of his behavior on March 27, 1984, and perform the acts which consisted of the other elements of the crime of which he was eventually convicted, without being "consciously aware" of his behavior, as Dr. Arbit, one of petitioner's expert witnesses, testified before the hearing panel? Of course, as a court of review, we cannot determine whether this inconsistency is the product of petitioner's dishonesty or was caused by a strategy which petitioner's attorney used at trial. Thus, this problem, on its own, could not be a determining factor in our review of petitioner's character. However, I believe this inconsistency can only weigh against petitioner, in light of the other more obvious examples of petitioner's untruthfulness.

I find that the trial court's determination that petitioner thought he was acting in the line of duty is similarly inconsistent with the "blackout" testimony before the hearing panel. (See 139 Ill. 2d at 245-46.) A person who has a sincere belief—even if totally fanciful—and who acts intentionally under that belief cannot be said to be without conscious awareness of his actions. Yet, Dr. Arbit testified that petitioner was not consciously aware of what he was doing. Again, this logical inconsistency alone would not lead me to conclude that petitioner lacks the character required for bar admission, because we have no way of determining whether the trial judge's

conclusion was based directly on petitioner's view of the events in question. However, in my estimation this evidence, if it can be construed as significant at all, merely adds to the more egregious evidence of petitioner's lack of veracity.