(No. 57374.—

*In re* IRWIN MARTIN BERKLEY, Petitioner.

*Opinion filed June 9, 1983.*

Jerome Larkin, of Chicago, for the Administrator of the Attorney Registration and Disciplinary Commission.

Albert E. Jenner, Jr., Carol R. Thigpen, and Thomas E. Lindley, of Jenner & Block, of Chicago, for petitioner.

JUSTICE UNDERWOOD delivered the opinion of the court:

The petitioner, Irwin Martin Berkley, was disbarred on consent (73 Ill. 2d R. 762) on September 26, 1973, shortly after his conviction in the Federal court of suborning perjury and his plea of guilty to charges of mail fraud and conspiracy to commit mail fraud. He filed a petition for reinstatement on September 22, 1980, pursuant to our Rule 767 (73 Ill. 2d R. 767). Following an evidentiary hearing, the Hearing Board of the Attorney Registration and Disciplinary Commission recommended that the petition be denied "on the sole ground that there has been no attempt at restitution." Petitioner subsequently made separate contributions of $5,000 each to the client reimbursement funds of the Illinois State Bar Associa-

tion and the Chicago Bar Association in lieu of direct restitution, and the Review Board of the Commission thereafter recommended that petitioner be reinstated. The Administrator has filed exceptions to the Review Board's report and recommendation.

Petitioner was admitted to the bar of Illinois in 1960. In 1961, after practicing law for a short period with two different law firms, he and two of his former classmates formed a law partnership in Chicago which was dissolved in 1965. Although continuing to share office space with his former partners, petitioner became a sole practitioner focusing almost exclusively upon personal injury work. In 1972, he was indicted for suborning perjury, mail fraud, and conspiracy to commit mail fraud in connection with his personal injury practice. Following a jury trial, petitioner was found guilty of suborning the perjury of three police officers who were to testify before the grand jury. He subsequently pleaded guilty to one count of mail fraud and one count of conspiracy in exchange for the government's agreement to dismiss the 10 remaining counts of mail fraud. He was sentenced to two concurrent four-year terms of imprisonment and fined $20,000. Petitioner's testimony in the disciplinary hearing established that during the 1967-71 period he "bought" cases from police officers and others, used inflated medical bills supplied by dishonest doctors to defraud insurance companies, and paid kickbacks to insurance adjusters. The chaser fees and kickbacks were sometimes absorbed by the clients.

Following petitioner's conviction and prior to his imprisonment he negotiated a sale of his law practice for the sum of $600,000, later reduced to $500,000, payable in installments over a period of several years.

While petitioner was incarcerated in the Federal correctional system, he became an acting rabbi, conducting religious services as well as group Bible discussions. In addition, he became a lecturer for the prison's "Positive Mental Attitude" program, a vice-president of the Jaycees and chairman of its

Toys for Tots program; he also worked with other inmates to develop their reading skills and served as a dental assistant. He was released after serving 19 months.

Since his release from prison, petitioner has been a quite successful real estate developer and investor, and the record indicates that he is highly regarded by the business and banking community with which he frequently deals. He also resumed his participation in many of the charitable, religious and civic activities with which he had been associated prior to his convictions and became active in several other service and religious organizations. Among these, petitioner is an active worker in the Safer Foundation, participating in vocational and rehabilitation programs for former inmates as well as serving as a member of the planning and development committee. He is a member of the board of directors of the B'nai Jacob Synagogue, an active member of the Variety Club and the Covenant Club, acting as chairman of the former's Theater Collection Drive for La Rabida Children's Hospital, and serving on various committees of the Covenant Club. He has sponsored and acted as moderator for a series of cultural programs and seminars for the Northside Synagogues (a consortium of synagogues), and contributed a compendium of religious books to the library of the Loop Synagogue. He has made numerous financial and other contributions to the Abe Saperstein Foundation and to the Arie Crown Hebrew Day School, where he is also a board member. In addition, he has participated in a number of fund-raising activities and has worked for and contributed to the Weitzmann Institute in Israel and the Spertus College of Judaica. Financial contributions to various colleges and synagogues in memory of his mother have been made by him, including establishing a scholarship fund at Beth Israel Congregation.

In addition to his own testimony, eight witnesses testified before the hearing panel on petitioner's behalf, including a rabbi, an associate judge of the circuit court of Cook County, the chancellor of Spertus College, a current business associate

of petitioner's, three attorneys, and a bank vice-president. The testimony of these witnesses need not be detailed here. It is sufficient to note that the witnesses believed that petitioner is a generous and compassionate person, remorseful about his past misconduct, completely rehabilitated, and that he conducts himself with the utmost honesty and integrity. They testified that, if readmitted to practice, his professional conduct would, in their opinion, evince the same qualities as his personal conduct now does.

The hearing panel, although characterizing petitioner's prior practice as a "dirty racket," found that he recognized the nature and seriousness of his misconduct, that his evidence of rehabilitation and good character was convincing, and that his current knowledge of the law was adequate. Apart from the failure to make restitution, the panel members considered his conduct since his disbarment to have been above reproach and that, except for the "blind spot" which he appeared to have regarding restitution, petitioner had been candid and forthright in presenting evidence. The panel did not find persuasive petitioner's explanation that he could not make restitution because his files were no longer available and that, in any event, even if he could reconstruct those files it would be impossible to determine the amount owing to former clients or insurance companies given the nature of his fraudulent scheme and the fact that he did not consistently adhere to it.

Petitioner urges us to adopt the Review Board's report and recommendation that his $10,000 contribution to the bar associations' client funds is sufficient restitution in view of his inability to determine which clients to reimburse, and further asks that we consider his generous post-prison charitable efforts and contributions. The Administrator suggests that petitioner's failure to attempt restitution evidences a continuing character defect and that the $10,000 contribution is minuscule in comparison to the actual amount of petitioner's "ill-gotten" gain as well as the amount of money petitioner re-

ceived as a result of the sale of his law practice. Thus, the Administrator concludes that petitioner has failed to demonstrate by clear and convincing evidence that he has been rehabilitated or is a sufficiently changed person to warrant reinstatement.

It is, of course, petitioner's burden to prove by clear and convincing evidence that he should be reinstated to practice law. (*In re Silvern* (1982), 92 Ill. 2d 188, 193; *In re Kuta* (1981), 86 Ill. 2d 154.) Our Rule 767 sets forth the following guidelines:

> "The panel shall consider the following factors, and such other factors as the panel deems appropriate, in determining the petitioner's rehabilitation, present good character and current knowledge of the law:
>
> (a) the nature of the misconduct for which the petitioner was disciplined;
>
> (b) the maturity and experience of the petitioner at the time discipline was imposed;
>
> (c) whether the petitioner recognizes the nature and seriousness of the misconduct;
>
> (d) when applicable, whether petitioner has made restitution;
>
> (e) the petitioner's conduct since discipline was imposed; and
>
> (f) the petitioner's candor and forthrightness in presenting evidence in support of the petition." (73 Ill. 2d R. 767.)

The seriousness of a petitioner's past misconduct is unquestionably an important consideration (see *In re Mandell* (1982), 89 Ill. 2d 14, 20; *In re Groshong* (1980), 83 Ill. 2d 27; *In re Cohen* (1981), 83 Ill. 2d 521) which cannot be minimized by subsequent exemplary conduct. The seriousness of petitioner's misconduct can hardly be overstated. In fact the hearing panel characterized it as "so bad that it could scarcely be worse." Nevertheless, the purpose of our disciplinary sanctions is not solely to punish, but to safeguard the public, maintain the integrity of the profession, and protect the administration of justice from reproach (*In*

*re Zahn* (1980), 82 Ill. 2d 489, 493; *In re Andros* (1976), 64 Ill. 2d 419, 423), and we have similar objectives in considering a petition for reinstatement *(In re Kuta* (1981), 86 Ill. 2d 154, 156-57). The focus in the previous cases has uniformly been on whether the petitioner has proved that he is rehabilitated and again fit to practice law. Rehabilitation has been defined as "a matter of one's 'return' to a beneficial, constructive and trustworthy role." *(In re Wigoda* (1979), 77 Ill. 2d 154, 159.) Given the nature of the evidence which petitioners usually present and the difficulty of accurately assessing the subjective qualities so important in a reinstatement case, this court has ordinarily given considerable weight to those findings of the hearing panel which represent an evaluation of the witnesses' credibility and the petitioner's candor, forthrightness and sincerity. *E.g., In re Wigoda* (1979), 77 Ill. 2d 154, 158-59; *In re Cohen* (1981), 83 Ill. 2d 521, 525.

It is apparent from petitioner's evidence, judged to be credible and convincing by the hearing and review boards, that he is now acutely aware of the importance of professional honesty and integrity, and that he is quite unlikely to again engage in any misconduct. Those actions have had a profound and traumatic effect on all aspects of his life, and his testimony as well as that of others demonstrates that he does indeed recognize the serious nature of those transgressions and deeply regrets the dishonor and disgrace he has brought upon his family, his profession and himself. Although petitioner and his wife were divorced in 1978, the record indicates that they are on amicable terms and that petitioner remains dedicated to his three children, the oldest of whom is currently a law student. While petitioner has not practiced law in any respect since his disbarment, he was, at the time of the hearing and for the purpose of updating his legal knowledge, a subscriber to and reader of the Supreme Court Reporter, the Chicago Daily Law Bulletin, and Illinois Institute of Continuing Legal Education

and Practicing Law Institute publications. In addition, he has attended several seminars and has collected a library of tapes dealing with such subjects as real estate, tax and corporate law, and has read and is familiar with the Code of Professional Responsibility adopted by this court subsequent to his disbarment. If readmitted, he indicates he has no intention of returning to personal injury work, is not motivated by potential financial gain, and would devote a substantial amount of his time to *pro bono* activities. Apart from the restitution question, in view of petitioner's essentially undisputed evidence showing his repentance and rehabilitation and the respect and trust he has gained from the business and banking community since his release from prison, and considering his extensive involvement in good works during the nearly 10 years of disbarment, we agree with the review and hearing boards that petitioner has met his burden of proving rehabilitation.

We are troubled, however, by the Administrator's argument that the amount of restitution made subsequent to the Hearing Board's recommendation is wholly inadequate. Although this court has stated that rehabilitation rather than restitution is the "controlling" consideration (*In re Thomas* (1979), 76 Ill. 2d 185), restitution is nonetheless an important factor as we recently emphasized in requiring a petitioner, as a condition of reinstatement, to contribute to the city the amount of a bribe he had retained (*In re Kuta* (1981), 86 Ill. 2d 154, 163). Our further consideration of the question as to when restitution should be required has caused us to conclude that restitution should be a condition of reinstatement except in those rare instances where repayment to the victims is conclusively established to be an impossibility. Then, but only then, should alternative methods such as that utilized here be considered. Petitioner's own testimony establishes that during the four-year period 1967-71 he received annually gross fees amounting to between $400,000 and $500,000 of which 90% were personal

injury fees and 10%-25% of those were the result of his fraudulent scheme. His inability to reconstruct the precise amounts due and the parties to whom they are due is the direct result of his own bookkeeping practices and failure to preserve his records. That fact, however, cannot totally eliminate the obligation, nor does the fact that some portion of the repayment might be due insurance companies, for failure to repay the companies simply increases premium costs to the policyholders. It is true that petitioner has been a generous contributor to many groups and organizations, and we do not adopt the Administrator's apparent position that we should disregard those contributions because petitioner was involved in some of those activities prior to his convictions and disbarment. Indeed, we have given considerable weight to that evidence, particularly petitioner's time commitments, in assessing his present good character. As the Hearing Board recognized, however, and petitioner implicitly acknowledges, those contributions were not made in lieu of direct restitution to clients who were admittedly defrauded, and we will not so regard them. There is here no showing, much less a conclusive one, of impossibility. Petitioner apparently permitted his files to be stored in a building which was subsequently demolished. There is nothing in this record to indicate he made any effort to preserve the names of the clients, individuals or companies from whom money was corruptly obtained or withheld. He has made no inquiry through the defrauded insurers as to the availability of their records. Nor has the possibility that the files of the United States Attorney and United States Postal Inspection Service might provide information been explored. Instead of first exhausting these and other possible means of identifying those to whom money was owed, petitioner made what were little more than token payments to the bar association client security funds, considering that the fraudulently obtained funds may have approximated $110,000 per year (.90 x $500,000

x .25).

We accordingly remand this petition to the Hearing Board with directions that petitioner be permitted an opportunity, at such reasonable time as he may request, to produce proof of restitution or conclusive proof of its impossibility.

*Cause remanded,*
*with directions.*

CHIEF JUSTICE RYAN, dissenting:

The opinion of my colleagues has focused on only one issue and has neglected the other elements which our Rule 767 states should be considered when passing on a petition for reinstatement. I therefore dissent.

This opinion, as have most of the opinions of this court involving reinstatement, focuses almost exclusively on the rehabilitation of the attorney. I think that this court, as well as the Review Board and the hearing panels, places too much importance on rehabilitation and does not give sufficient consideration to the seriousness of the conduct of the attorney which was the basis for his disbarment. In my opinion, there are certain infractions that are so serious that the attorney committing them should never be readmitted to the practice of law.

The hearing panel characterized petitioner's conduct as "so bad that it could scarcely be worse." Our Rule 767 provides that the hearing panel, among other matters, shall consider "the nature of the misconduct for which the petitioner was disciplined." (87 Ill. 2d R. 767.) If petitioner's conduct was as bad as the hearing panel found it to be, it appears to me that not much attention has been given to the quoted requirement of Rule 767 by the hearing panel, the Review Board or this court in passing on the petition for reinstatement.

In this case, we have an attorney who, through his unethical conduct, was able to make large sums of money for

several years. Furthermore, when he was caught and convicted, he sought and acquired further economic gain by selling his law practice for a half million dollars, which in itself is questionable conduct. I do not think that this court should write a script that tells the profession and the public that attorneys can engage in unethical conduct and make a substantial amount of money. Then when they are caught, all they have to do is to profess to change their ways and they will again be permitted to hold themselves out to the public as members of an honorable and trusted profession.

In almost every petition for reinstatement the scenario is the same. The hearing before the hearing panel consists of a parade of witnesses telling of the penitence and good works of the disbarred attorney which, it is urged, demonstrate that he is rehabilitated. I wonder if good works are actually evidence of rehabilitation or if too much emphasis is placed on such conduct. Some individuals are naturally aggressive and extroversive. It is a simple matter for them to rechannel the same attributes that got them into trouble and thus compile an impressive record of public good. Others are less aggressive and less outgoing and do not accomplish as much good for the public. However, in terms of true rehabilitation, those of the latter group may have more completely changed their ways than those of the former.

Regardless of the degree of rehabilitation, I do not think that an attorney should be able to prosper financially at the expense of the legal profession and, when he can profit no further, proclaim that he has changed his ways and be readmitted to the profession he so degraded by his prior conduct.

JUSTICE MORAN joins in this dissent.