(No. M.R. 16045.— ▮▮▮▮▮▮▮▮)

*In re* JEROME KRULE, Petitioner.

*Opinion filed December 1, 2000.*

MILLER, J., joined by RATHJE, J., specially concurring.
McMORROW, J., concurring in part and dissenting in part.
Disciplinary proceeding.

Craig D. Tobin, of Chicago, for petitioner.

George J. Murtaugh, Jr., of Chicago, for the Committee on Character and Fitness.

CHIEF JUSTICE HARRISON delivered the opinion of the court:

Jerome Krule petitioned this court for review of the most recent recommendation by the Committee on Character and Fitness (the Committee) that he not be certified for admission to the bar. 166 Ill. 2d R. 708(d). After the Committee filed its response, we allowed Krule's petition and permitted the parties to present oral argument. For the reasons that follow, Krule's application for admission to the bar is denied.

Jerome Krule graduated from the John Marshall Law School in 1994. In 1995, the Committee on Character and Fitness (the Committee) voted not to recommend certification of Krule for admission to the practice of law. In reaching that decision, the Committee was most concerned with Krule's participation in an insurance fraud scheme which resulted in his conviction of a felony in 1988. The Committee felt that Krule was less than candid in describing his role in the scheme and he had not adequately demonstrated that he was rehabilitated. The Committee also expressed concern over Krule's apparent lack of candor in failing to apprise his law school of three previous misdemeanor convictions.

Krule sought a new hearing in 1996. Because his request was made prior to expiration of the requisite two-year waiting period following the Committee's 1995 decision, it was denied. Bar Admission Rule 9.1. Krule then filed another petition for a new hearing in 1998. This time the Committee granted the petition, and the hearing panel convened a new hearing in the case in March of 1999.

After taking evidence, the hearing panel concluded that Krule had failed to meet his burden of proving by clear and convincing evidence that he possesses the

requisite moral character and general fitness to practice law. The hearing panel further concluded that Krule had once again failed to show that he had been sufficiently rehabilitated. Based on these conclusions, the Committee adhered to its original decision and voted not to recommend certification of Krule.

In undertaking our review of the Committee's decision, we begin by noting that the final judgment regarding admission of an applicant to the practice of law rests with this court. As a general rule, a determination by the Committee on Character and Fitness concerning the character and fitness of an applicant neither binds this court nor limits our authority to take action. *In re Loss*, 119 Ill. 2d 186, 192 (1987). We have also held, however, that where a hearing panel concludes that a petitioner does not possess the good moral character and general fitness necessary for the practice of law and recommends that certification be denied, as was the case here, this court will not reverse unless that recommendation was arbitrary. *In re Glenville*, 139 Ill. 2d 242, 252 (1990).

The criminal conviction which led to the original denial of Krule's certification arose from a scheme he facilitated to systematically defraud insurance companies. At the time, Krule was a licensed insurance professional. He testified that he contacted an attorney named George Anderson to "go into business with him in personal injury." The business worked this way.

Anderson owned some taxi cabs, and Krule took a job in his office. When one of the taxi drivers was involved in an accident, Krule would arrange for him to see a Dr. Starkman. With Krule's knowledge and complicity, Starkman would deliberately generate inflated bills containing charges for services that were not necessary or were not performed. Krule, in turn, would submit the fraudulent bills to insurance companies for reimbursement. Krule engaged in this activity from August of 1986 through

February of 1987. During this period he submitted scores of false claims to eight different insurance companies.

Krule's insurance fraud scheme ended with an 82-count indictment issued by a Du Page County grand jury. Named as defendants were Krule, attorney Anderson, Dr. Starkman, and six other individuals. Krule pled guilty to one count of theft, a felony, in exchange for his testifying as a government witness. He was sentenced to 30 month's probation. As a condition of probation he was required to complete 950 hours of community service and pay $5,000 in restitution. Krule's probation was terminated satisfactorily on October 1, 1990.

Attorney Anderson also pled guilty to theft. He was ordered to pay a fine of $100 and $77 in court costs and was placed on conditional discharge. The condition imposed by the sentencing judge was that Anderson was required to file a motion with our court for disbarment on consent. Anderson filed such a motion on February 16, 1990, and it was allowed by this court on March 27, 1990.

Following these developments, Krule applied to and was accepted for admission by the John Marshall Law School. As previously indicated, Krule graduated from there in 1994. The Committee on Character and Fitness subsequently refused to certify him for admission to the bar, primarily because of his felony conviction and the nature of his involvement in the insurance fraud scheme.

In ruling as it did, the Committee noted Krule's lack of candor about these events when he applied for law school. Krule characterized his role as that of a "clerk," even though his testimony at trial indicated that he played a far more substantial role and helped devise the scheme. A letter written by Krule to the law school's dean contained falsehoods, and the Committee found that Krule had refused to accept responsibility for his illegal and unethical conduct. Finally, the Committee

expressed concern that Krule had failed to disclose three misdemeanor charges, two of which involved pleas of guilty, on his law school application. Krule admitted that the reason he was not truthful about those charges is that he feared they would jeopardize his chances for admission into law school.

Following his felony conviction, Krule obtained employment and engaged in volunteer and charitable activities beyond those necessary to comply with the terms of his probation. The Committee acknowledged these factors and took note of positive testimony from character witnesses. The Committee nevertheless concluded that "specific evidence" of rehabilitation was lacking. The Committee also cautioned Krule that

> "an applicant for admission does not become entitled to certification of his character and fitness simply by fulfilling the educational requirements and by participating in civic and charitable activities."

When Krule obtained a new hearing in 1999, he testified on his own behalf. He told the Committee that he would consider his law license his most valuable possession. He has worked in the Evanston community defender office and served as a teacher of English as a second language in the Oakton Community College adult education program. He stated that he would like to practice law in the public sector and intended to continue his volunteer work regardless of the Committee's decision.

Krule admitted that because he was an insurance professional at the time, "maybe he had more of a major role" than the other participants in the insurance fraud scheme that resulted in his felony conviction. He expressed remorse for his illegal conduct and said he regretted his failure to report the misdemeanor convictions when he submitted his law school application.

In addition to testifying himself, Krule presented the testimony of seven character witnesses. One of these was

Associate Circuit Judge Fe Fernandez of the circuit court of Cook County, who appeared on Krule's behalf.[1] Prior to taking the bench, Judge Fernandez had worked with Krule at the Evanston community defender office. According to Judge Fernandez, Krule had done volunteer work at the community defender office on an "as needed" basis since he was denied certification in 1995. Robert Roy, director of the community defender office, also testified. Roy and Judge Fernandez opined that Krule is honest, trustworthy and dedicated to his goal of becoming a lawyer.

Additional testimony was provided by Patricia McCarthy, a reading specialist at East Prairie school district in Skokie, and Marilyn Antonik, program manager for volunteer teaching in the adult education division and coordinator of the adult literacy program at Oakton Community College. McCarthy and Antonik described Krule's work with Oakton Community College and reported that he was generous in donating his time and dedicated to his students. They also attested to his trustworthiness.

Edward Michael Reilly, a Chicago police officer and lawyer who had attended law school with Krule, said that Krule would be an ethical lawyer. Ralph Ruebner, a professor at John Marshall Law School, and Elmer Gertz, a former professor at John Marshall Law School, testified that they had known Krule since he was a law student. Gertz is also a friend of Krule's family. Ruebner believed that Krule had matured, and both professors thought that he could be a competent and trustworthy lawyer.

---

[1]There is no indication in the record that Judge Fernandez was subpoenaed. He appears to have given testimony on Krule's behalf voluntarily. If that is so, we feel constrained to point out Judge Fernandez's decision to support Krule at his hearing may violate canon 2(B) of the Code of Judicial Conduct (155 Ill. 2d R. 62(B)), which expressly states that "a judge should not testify voluntarily as a character witness."

In addition to the foregoing testimony, Krule presented affidavits from George Leighton, formerly a United States district judge; Dean Robert Johnston of the John Marshall Law School; and Professor William Carroll and Professor Seng, also of John Marshall. All of these men supported Krule's application and attested to his fitness to practice law.

Following the hearing, witness Marilyn Antonik, from Oakton Community College, reported an incident to the Committee that changed her opinion of Krule's judgment and trustworthiness. According to Antonik, Krule met with a foreign student at the college and gave her a gift and a personal note. He also offered to help her obtain a visa.

In his note to the student, which was signed "Love, Jerry," Krule offered to give the student money for a round trip plane ticket to and from her homeland. This incident frightened the student, who brought it to the attention of college officials. As a result, Antonik terminated Krule's services with the college.

The Committee received a copy of Krule's note to the student as well as a copy of a statement from the student regarding Krule's actions. One of the things the student claimed in her statement was that Krule had shown her a card indicating that he was a lawyer. She also said that Krule had told her not to show the note to anyone and that the incident scared her.

In response to this development, Krule's attorney wrote to the Committee and submitted an affidavit from Krule. In his affidavit, Krule attested that he did not present himself as an attorney to the student. Rather, he told her he was a paralegal for the Evanston community defender. The card he showed her was his John Marshall alumni card. He has no business cards.

Based upon the foregoing evidence, the Committee decided, by a vote of 6 to 1, to adhere to its previous de-

termination. The Committee held that Krule had failed to show that he had been "sufficiently rehabilitated to demonstrate that he possesses the character and fitness to practice law." Accordingly, it concluded that it could "not recommend the certification of Krule and his application to be admitted to the practice of law in Illinois is therefore denied."

In assailing the Committee's determination, Krule takes particular issue with the Committee's consideration of the post-hearing events involving Krule and the foreign student. Krule contends that the evidence considered by the Committee consisted of inadmissible hearsay. He claims that before the Committee relied on the information from Antonik, it should have afforded him the opportunity to subpoena and depose her under oath.

The objections Krule raises to the Committee's procedures are not insignificant. With respect to the matter of the lawyer identification card, we note that the student was Japanese, and her statement regarding the incident was written in Japanese. It is entirely possible that she misunderstood what Krule had told her about his professional status or that she did understand it, but the translator simply conveyed what she had written incorrectly when putting it into English. The way the Committee handled this evidence, Krule had no opportunity to explore these possibilities.

Even if the procedures followed by the Committee were not subject to challenge, the Committee should not have allowed the post-hearing events involving the foreign student to affect its ultimate decision. Both Krule and the woman were adults. Krule was not the woman's teacher and held no position of authority over her. The gift he gave her was a cosmetics case, and he made the offer regarding the plane ticket because she had expressed an interest in returning to the United States.

While he had a romantic interest in the woman, he did not attempt to force himself on her in any way. When she did not respond to his overtures, the matter ended. The two had no further communication. The woman returned to her homeland, and Krule went about his business. We fail to see how any of this bears on Krule's fitness to practice law.

Having said that, we nevertheless conclude that the Committee's decision to deny Krule's petition for admission to the bar must be upheld. Contrary to Krule's assertions, the incident involving the foreign student was incidental to the Committee's final determination. In ruling as it did, the Committee reviewed the circumstances which led to its previous decision, then focused on whether Krule had shown by clear and convincing evidence that his rehabilitation is such that he is a fit person to practice law. See *In re Loss*, 119 Ill. 2d at 196-97.

The criteria applied by the Committee were those set forth by our court in *In re Childress*, 138 Ill. 2d 87, 100 (1990):

" '(1) [C]ommunity service and achievements, as well as the opinions of others regarding present character; (2) candor before the court; (3) the age of the applicant at the time of the offenses; (4) the amount of time which has passed since the last offense; (5) the nature of the offenses; and (6) the applicant's current mental state.' " Quoting *In re Loss*, 119 Ill. 2d at 196.

The Committee noted that Krule had performed "a good amount of community service" since the Committee had last considered his case. It credited him with caring for his elderly and infirm parents. It acknowledged the array of character witnesses he presented, which was impressive by any standard. Especially significant to the Committee was that the people with whom Krule worked at the Evanston community defender's office have placed their trust and confidence in him.

In contrast to the situation in 1995, when he was

first turned down by the Committee, Krule acknowledged his full role in the insurance fraud scheme, "noting that as an insurance professional he had knowledge about the operations of the industry that helped to further the criminal enterprise." He also expressed his remorse for "the impact his participation had on individuals and organizations."

Despite these developments, the Committee believed that the positive aspects of Krule's application were still outweighed by the nature and gravity of the criminal offense for which he had been convicted. While a mature adult and a licensed professional, he utilized his professional knowledge to help carry out a criminal scheme involving deception and dishonesty. Thereafter, he attempted to minimize his role in the scheme, made misrepresentations, and failed to disclose three misdemeanors on his law school application.

Although Krule was a reliable and committed worker, the Committee pointed out that his volunteer work "did not entail the kind of independence or the exercise of judgment that would permit a prediction about how Krule would perform in a setting that did." In the Committee's view, the circumstances present when the insurance fraud scheme was formulated back in the 1980s provided a better insight into how Krule might perform as a lawyer when his independence and judgment were challenged. The results were not good. Krule chose to commit a felony.

Based on the record before it, the Committee was not satisfied that the result would be different today. Krule professed that he was sorry and had changed, but the Committee believed that his words and actions may have been designed simply to satisfy the requirements of bar admission. Moreover, to the extent Krule was remorseful, the Committee believed that it may have been remorse that his conduct interfered with his bar admission rather

than a genuine appreciation for how his illegal conduct affected others.

In *In re Glenville*, 139 Ill. 2d 242 (1990), the applicant had a history of juvenile delinquency, arrests for battery and convictions for disorderly conduct, driving under the influence, and theft. In *In re Childress*, 138 Ill. 2d 87 (1990), the applicant had been convicted of rape and robbery and sentenced to prison while a teenager. In *In re Loss*, 119 Ill. 2d 186 (1987), the applicant's history involved juvenile delinquency and convictions for disorderly conduct, possession and sales of marijuana and other drugs, and theft.

In each of the foregoing cases, our court denied the applicant's petition for admission. Although the crime for which Krule was convicted may not be as serious as some of the offenses committed by Glenville, Childress and Loss, we note that Krule was a mature adult when he engaged in the fraudulent scheme that culminated in his conviction. Moreover, his criminal scheme arose in the context of circumstances comparable to those with which he would be faced as an attorney, evincing an inability on Krule's part to carry out his professional responsibilities honestly.

In that regard, the case is similar to *In re Ascher*, 81 Ill. 2d 485 (1980). Ascher was an accountant, licensed insurance agent and broker, licensed real estate broker, and an "enrolled agent" with the Internal Revenue Service who attended law school later in life. Prior to passing the bar exam, he was sued by a client for fraud and breach of his fiduciary duty as a tax accountant and real estate agent-broker. He was also found to have engaged in a subterfuge to practice law without a license. Even though Ascher's conduct did not lead to criminal charges as Krule's did, this court nevertheless concluded that it raised fundamental questions regarding his "capacity to make those ethical judgments required of an attorney in

the course of his practice and the performance of his fiduciary responsibilities." *In re Ascher*, 81 Ill. 2d at 500.

In denying Ascher's application for admission to the bar, this court wrote,

> "The integrity of our profession can be no greater than that of its members, and we protect neither our profession nor the public when we admit to the profession those who have demonstrated the insensitivity to its standards which is evident here." *In re Ascher*, 81 Ill. 2d at 502.

We believe this sentiment is applicable to the matter before us today. As impressive as Krule's character references and public service may be, an applicant's subsequent exemplary behavior cannot lessen the enormity of an earlier offense. *In re Childress*, 138 Ill. 2d at 101. As we held in *In re Childress*, 138 Ill. 2d at 104, and as the Committee itself indicated when it last refused to recommend Krule, applicants do not become entitled to admission simply by fulfilling our educational requirements and participating in civic and charitable activities.

The public depends on this court to select qualified professionals who will be conscientious in protecting their clients and upholding the law. We take that responsibility seriously. As careful as we try to be in the selection process, however, we cannot detect every failing that may afflict an attorney. All we can do is make our best judgment based on the results of the bar exam, the contents of the applications and supporting documents, and the recommendations from the Committee.

With each law license we confer, there is a risk that the attorney will not live up to his professional responsibilities. We depend on the Committee to help us assess that risk. In this case, the Committee has determined, in effect, that the risk is too great. We cannot say that its determination is arbitrary. What Krule did in defrauding the insurance companies is precisely the sort of conduct which has brought the legal profession into disrepute. He failed to convince the Committee that he is not going to

repeat that conduct, and he has failed to persuade us. In our view, Krule's admission would deprecate the seriousness of his crime and undermine the integrity of our profession.

For the foregoing reasons, Krule's application for admission to the bar is denied.

*Petition denied.*

JUSTICE MILLER, specially concurring:

I agree with the majority that the petitioner's application for admission to the bar of this state must be denied. I write separately to explain more fully the basis for my agreement with that determination and to respond to Justice McMorrow's dissent in this case.

As the majority recounts, the petitioner, while a licensed insurance professional, took part in an extensive scheme to systematically defraud insurance companies. The petitioner took a job in the office of a person who owned taxi cabs. Whenever a driver was involved in an accident, the petitioner would have the person go to a particular doctor. The doctor would later send out inflated bills containing charges for unnecessary or unperformed services. The petitioner would then submit the bills to insurance companies for reimbursement. This activity went on from August 1986 through February 1987; according to the petitioner, he submitted scores of fraudulent claims to eight different insurers. Indicted the next year, the petitioner was later allowed to plead guilty to one count of the 82-count indictment in exchange for his testimony as a witness for the prosecution.

Justice McMorrow asserts that the effect of today's decision denying the petitioner's application for admission to the bar "is to impose additional punishment upon him after he has been tried and served the sentence which was deemed appropriate by agreement of the court and the prosecution in his criminal case." 194 Ill. 2d at

134 (McMorrow, J., concurring in part and dissenting in part). Justice McMorrow apparently believes that the seriousness of an applicant's offense must necessarily fade over time, and that, in any event, the severity of the misconduct should be measured simply by the criminal sanction imposed at the time of prosecution.

These notions are contrary to long-standing precedent of this court. In *In re Childress*, 138 Ill. 2d 87 (1990), an applicant who had been convicted of rape and robbery 16 years earlier applied for admission to the bar of this state, long after his release from prison. The court observed that a felony conviction will not automatically preclude an applicant's admission to the bar, or a disbarred attorney's subsequent reinstatement. The court further explained:

> "It is clear, however, that the degree of rehabilitation that must be established to warrant admission or reinstatement will depend in large measure on the nature of the wrong committed. Just as a disbarred attorney's subsequent exemplary behavior will not mitigate the seriousness of his misconduct (*In re Alexander* (1989), 128 Ill. 2d 524, 534-35; *In re Berkley* (1983), 96 Ill. 2d 404, 410), so too will an applicant's subsequent exemplary behavior fail to lessen the enormity of an earlier offense." *Childress*, 138 Ill. 2d at 101.

Despite the lengthy period of time in that case between the petitioner's offenses and his application, this court concluded that time alone was not sufficient to overcome the enormity of the applicant's misconduct. The court stated, "While a person's conduct in the ensuing years is, of course, a relevant circumstance in assessing rehabilitation, we do not believe that the passage of time by itself is sufficient to demonstrate the rehabilitation that is required of someone with a criminal record such as petitioner's." *Childress*, 138 Ill. 2d at 102.

A number of considerations are relevant in this case. The petitioner was involved in an extensive, fraudulent scheme, and he played an active role in the commission

of those offenses. Moreover, the petitioner was 45 years old at the time of his involvement; thus, his offenses were not youthful indiscretions, but the work of a mature adult, and they were closely related to what was then his career in insurance. Also, the petitioner, who applied to and was accepted by his law school after these offenses, was not completely candid to the school about this misconduct and, separately, failed to report on his law school application three prior misdemeanor charges, two of which resulted in guilty pleas. Just as there are some offenses so egregious that a lawyer who has been disbarred for committing them may never be readmitted to the bar (*In re Richman*, 191 Ill. 2d 238, 247-48 (2000); *In re Rothenberg*, 108 Ill. 2d 313, 326 (1985)), so too, I believe, are there offenses so serious that one who has committed them should never be entitled to admission to the bar in the first place. Without determining whether the present offenses fall into that category, I believe that it is clear that the petitioner's application must be denied. The nature and gravity of the petitioner's misconduct, his age when he engaged in it, and his later lack of candor concerning these and prior offenses on his law school application and in the ensuing application process all militate against his admission to the bar.

JUSTICE RATHJE joins in this special concurrence.

JUSTICE McMORROW, concurring in part and dissenting in part:

I am in agreement with the majority that the evidence relating to the post-hearing events involving petitioner Jerome Krule and a foreign student was inappropriately admitted and should not have affected the ultimate decision of the Committee on Character and Fitness (Committee). I respectfully dissent, however, from the majority's denial of petitioner's application for admission to the bar.

Initially, I recognize that the privilege to practice law is exactly that, a privilege and not a right. However, that privilege should not be denied absent cogent reason. Although, in reviewing the merits of petitioner's application for admission to the bar, my colleagues note the many positive aspects of his application, they nevertheless find that "[a]s impressive as Krule's character references and public service may be, an applicant's subsequent exemplary behavior cannot lessen the enormity of an earlier offense." 194 Ill. 2d at 120. After stating that petitioner's involvement in the insurance scheme is "precisely the sort of conduct which has brought the legal profession into disrepute," the majority concludes that Krule "failed to convince the Committee that he is not going to repeat that conduct, and he has failed to persuade us. In our view, Krule's admission would deprecate the seriousness of his crime and undermine the integrity of our profession." 194 Ill. 2d at 120-21.

As I studied and pondered the majority opinion, one lingering question always remained: What more could petitioner have done that he did not already do to enable him to be allowed the privilege to practice law? Stated otherwise, is there anything petitioner failed to do to justify refusing him a license to practice law? The majority does not answer this essential question. Instead, in denying Krule's admission application, my colleagues appear to single-mindedly focus upon the seriousness of petitioner's past offense, to the virtual exclusion of the ample amount of positive evidence presented in petitioner's favor during the Committee hearing.

The analysis employed by the majority in assessing the merits of petitioner's admission petition does not adhere to this court's prior pronouncements with respect to evaluating whether an individual has shown sufficient rehabilitation of character and fitness so that an application for admission to the bar may be granted. It is well

settled that, although the nature of an applicant's past misconduct is one important consideration in assessing his or her rehabilitation, a record of felony conviction need not by itself automatically preclude one's admission to practice law in Illinois. *In re Childress*, 138 Ill. 2d 87, 100-01 (1990); *In re Loss*, 119 Ill. 2d 186, 196 (1987); *In re Mitan*, 75 Ill. 2d 118, 126 (1979). Additional factors to be considered in determining a petitioner's rehabilitation are the petitioner's record of community service and achievements, as well as the opinions of others with respect to petitioner's present character; the candor of petitioner before the court; petitioner's age at the time of the offenses; the amount of time which has passed since the last offense; and the current mental state of petitioner. *Childress*, 138 Ill. 2d at 100; *Loss*, 119 Ill. 2d at 196.

Both the Committee in its findings, and the majority in its opinion, stress that although Krule presented a substantial amount of evidence in his favor during the hearing, this evidence did not overcome his 1988 felony conviction. There is no question that petitioner committed a serious offense and that he was a mature adult when he engaged in this misconduct. However, the seriousness of petitioner's crime has already been adjudicated. The record reveals that, as part of an agreement with the prosecuting office, petitioner pled guilty to one count of theft, in exchange for his assistance in investigating the insurance scheme and for his testimony on behalf of the government against other scheme participants. At the culmination of the criminal proceedings, the trial court evaluated petitioner's offense and sentenced him to 30 months' probation, conditioned upon his performance of 950 hours of community service. The record also reveals that the court released petitioner early from his probation.

It is axiomatic that the seriousness of petitioner's

crime *remains constant*. It does not diminish with the passage of time. It is precisely because the gravity of the offense will be the same 10, 15, or 20 years henceforth—and forevermore—that this court has looked to factors in addition to the seriousness of the crime committed to determine whether an applicant has been sufficiently rehabilitated to be admitted to the practice of law. In other words, we must consider the seriousness of petitioner's offense against the backdrop of the various indicia of rehabilitation of character and fitness. The egregious conduct of petitioner, though deserving of considerable weight, should not be the overriding factor in assessing petitioner's fitness to practice law. The majority clearly primarily bases its decision on the crime petitioner committed more than 10 years ago.

As stated, this court has previously held that a petitioner's community service and achievements, the opinions of others regarding his present character, petitioner's candor about his past misconduct, and his present mental state all constitute important indicia of rehabilitation. A wealth of information with respect to these factors was introduced by petitioner during the hearing. It was established that since 1995, petitioner has performed extensive volunteer work with the Evanston Community Defender Office (ECDO), which provides free legal and social work services to low income Evanston residents under the age of 21. Robert Roy, the director of ECDO, and Judge Fe Fernandez, a former staff attorney with this organization, testified on petitioner's behalf. Both witnesses informed the Committee that, at the time petitioner approached them about volunteering with their organization, he was very open about his background. In Roy's words, petitioner spoke with "agonizing candor" about his past difficulties. Both Roy and Fernandez stated that petitioner acknowledged that he made serious mistakes in his past, that his involve-

ment with the insurance scheme was wrong, and that he showed a great deal of remorse for his past misconduct. Roy testified that there was no question in his mind that petitioner accepted full responsibility for his past criminal behavior. Roy informed the Committee that he frequently discussed ethical issues with petitioner, and that he often provided petitioner with written materials concerning ethics in the law.

Both Roy and Fernandez testified that petitioner performed a wide variety of legal and nonlegal tasks while volunteering at ECDO, including answering telephones, transporting witnesses to and from court, interviewing clients for background information, serving subpoenas, conducting factual investigations, and performing some legal research. Both witnesses testified that petitioner did a very good job in completing all tasks assigned to him, that he showed genuine concern and compassion for the clients, that he communicated well with the clients, and that the clients had many positive things to say about petitioner. Fernandez testified that petitioner would make an "excellent" lawyer, and Roy stressed that petitioner took his work very seriously and had been "very responsible." Both witnesses characterized petitioner as honest and trustworthy, and both recommended him for the bar without hesitancy or reservation.

During the hearing it was also established that for the past several years petitioner served as a volunteer tutor for adult literacy and education at both Oakton Community College and at the East Prairie School District in Skokie. Marilyn Antonik and Patricia McCarthy, the supervisors of these respective programs, testified that petitioner interacted very well with the students, who come from many different cultural backgrounds. Both witnesses attested to petitioner's dedication to his students, with McCarthy describing petitioner

as "very supportive, and concerned and caring," and with Antonik testifying that petitioner "has gone way beyond what a tutor needs to do." Both witnesses stated that petitioner has generously devoted his time to these programs, and described him as "trustworthy," "sincere" and "committed." Antonik expressed the "utmost confidence" in petitioner, testified that he conducted himself in a "professional" manner, and drew a distinction between petitioner's sincere commitment to his students and that of other volunteers who were required to do community service and who simply went "through the motions."

Also testifying on behalf of petitioner was Ralph Ruebner, a professor at John Marshall Law School. Professor Ruebner stated that he became acquainted with petitioner as a result of their living in the same neighborhood, and when petitioner began attending John Marshall, they struck up a friendship. Professor Ruebner testified that petitioner candidly revealed to him his past difficulties, and that Ruebner recommended that petitioner volunteer at ECDO because he felt it would "contribute to his rehabilitation process." Professor Ruebner, a highly respected member of the legal community, expressed his belief that petitioner has "fully rehabilitated himself," explaining that he has observed significant changes in petitioner's behavior over the past years. Professor Ruebner stated that petitioner has "matured," to the extent that he is very humble and expresses remorse and responsibility for his past wrongdoing. Professor Ruebner also testified that petitioner is a very caring individual, as evidenced by the type of community work he has done, as well as by the fact that petitioner is the primary caregiver for two very ill, elderly parents. Professor Ruebner concluded that petitioner would make a competent and trustworthy lawyer.

Attorney Elmer Gertz also testified on petitioner's

behalf. Gertz related that petitioner had been one of his students at John Marshall Law School and also that petitioner was a family friend. In Gertz's view, petitioner would be an ethical and trustworthy lawyer. Gertz also testified that, because of petitioner's adverse experiences in the past, petitioner would be keenly aware of ethical problems and would know what situations to avoid.

The final witness for petitioner was Edward O'Reilly, a sergeant with the Chicago police department and a fellow classmate of petitioner at John Marshall. Sergeant O'Reilly testified that petitioner was supportive of him during law school, and described petitioner as a "good human being" who is "kind," "trustworthy," "reliable," and "honest." O'Reilly informed the Committee that, during law school, petitioner candidly disclosed his background to him, and at that time petitioner was embarrassed and sorry for his past misconduct. O'Reilly stated that petitioner would be "an asset" to the bar, and that petitioner's past experiences "would be a positive influence on his practicing law." In O'Reilly's opinion, petitioner is "fully rehabilitated," and he would conduct himself in a law-abiding and ethical manner. O'Reilly concluded that although he always had a high opinion of petitioner, that opinion has been further increased by petitioner's extensive volunteer community work.

Petitioner also testified during the hearing. Petitioner stated that if he were to attain a law license, he would treat it "[a]s if it were gold." On several occasions during his testimony, petitioner expressed remorse for his past misconduct. Petitioner testified that he has "moved in every possible direction to correct that type of behavior and to make sure that it won't happen again." According to petitioner, his motivation for cooperating with the authorities during the insurance scheme prosecution was to "try and correct some of the harm that I did and put

an end to it also." Petitioner revealed that he testified in the criminal case involving other defendants who had participated in the insurance scheme, even though he had received death threats, and even though his agreement with the prosecution did not require him to do so. Petitioner also stated that by performing his present volunteer community service, "I've tried to correct what I did or do what I can to correct what I did." Although petitioner stated that he realized that he cannot "erase" his past misconduct, he testified that "I can do everything in my power to change myself, which I have tried to do, tried to grow and develop in another direction totally, and I'm very sorry for what I did." Petitioner also candidly admitted to the Committee that he played a "major role" in the insurance scheme, and acknowledged that he used his "insurance experience" in furtherance of that scheme. Petitioner testified that if he is ever able to practice law, his desire is to practice in the public sector, perhaps even as an attorney with ECDO.

Also submitted in support of petitioner's application for admission were several affidavits attesting to his rehabilitation and fitness. Judge George Leighton, formerly of the United States district court and a past commissioner and chairman of the Committee on Character and Fitness, stated that he became acquainted with petitioner when petitioner was a student at John Marshall. Judge Leighton averred that petitioner is a fit applicant for admission to the bar and stressed that he does "not make this statement lightly." Judge Leighton stated that petitioner has conducted himself in an "outstanding fashion," and he commended petitioner for his dedication to his volunteer work and his willingness to assist those less fortunate. Judge Leighton concluded by stating that petitioner has shown a "true desire to be a productive contributing member of society" and that his conduct "demonstrates that he has been totally rehabilitated."

Also submitting affidavits on petitioner's behalf were several faculty members of John Marshall Law School. Robert Johnston, the dean of John Marshall, averred that prior to petitioner's acceptance at the school, then-Dean Helen Thatcher interviewed petitioner and reviewed the circumstance of his conviction. Dean Johnston stated that, based upon conversations with John Marshall faculty and staff, petitioner was open and candid with Thatcher about the circumstances of his conviction. Dean Johnston further stated that while a student at John Marshall, petitioner conducted himself in an ethical manner and "accepted responsibility for his conviction." Dean Johnston believes that petitioner understands the ethical obligations of the legal profession and will abide by them. Professor William Carroll averred that he became acquainted with petitioner while he was a student in three of his classes. Citing petitioner's extensive volunteer work on behalf of indigent individuals, Professor Carroll concluded that petitioner has "conducted himself in an exemplary fashion and has demonstrated his rehabilitation."

In sum, several highly regarded members of the legal community offered evidence in support of petitioner's application for admission to the bar. The import of this uncontroverted evidence is that petitioner is a trustworthy and honest individual, that he has been candid about his past misconduct, that he accepts responsibility for his part in the insurance scheme, that he has expressed remorse, and that, based upon his performance and service to the community in the more than a decade that has followed his conviction, his admission to the bar should be approved. Indeed, both the Committee in its findings, and my colleagues in their opinion, acknowledge that petitioner has performed "a good amount of community service" since 1995, and that he assembled an "impressive" group of character witnesses who at-

tested to his rehabilitation, remorse for his past conduct, and his fitness to practice law. Inexplicably, however, both the Committee and the majority discount the value of this uncontradicted evidence, and instead resort to mere speculation and unsupported conclusions as the basis for denying petitioner's application for admission to the bar.

Indeed, this court has recently spoken against relying on speculation in the context of attorney fitness matters. In *In re Eckberg*, 192 Ill. 2d 70 (2000), we held that imposition of conditions upon an attorney's continued practice of law, based on incapacity, was not warranted. We rejected the recommendation of the Review Board that, based upon the attorney's past mental health problems, he only be allowed to practice law on the condition, *inter alia*, that he continue in the course of regular mental health treatment to avert a relapse. We held that "[i]t would be too speculative for this court to conclude that, in the future, respondent will experience mental difficulties which will incapacitate him from continuing to practice law." *Eckberg*, 192 Ill. 2d at 89-90. Although the context of the case at bar is somewhat different from that in *Eckberg*, this rationale applies with equal force here, and establishes that the majority's reliance upon speculation is inappropriate.

For example, despite the extensive amount of evidence introduced with respect to the scope, extent and beneficial value of petitioner's volunteer work, the majority accepts the Committee's unsupported conclusion that "the circumstances present when the insurance fraud scheme was formulated back in the 1980s provided a better insight into how Krule might perform as a lawyer." 194 Ill. 2d at 118. The majority draws a similarly unsupported and hypothetical conclusion when it writes that petitioner's "criminal scheme arose in the context of circumstances comparable to those with which he would be faced as an attorney, evincing an inability on

Krule's part to carry out his professional responsibilities honestly." 194 Ill. 2d at 119. There is no basis in the record from which the majority may validly rely upon in such speculation.

Additional unsupported and speculative conclusions are accepted by the majority with respect to the motivation and sincerity of petitioner's candor in acknowledging responsibility for his part in the insurance scheme, as well as petitioner's remorse for his past misconduct. Completely discounting the veracity of petitioner's testimony, my colleagues not only accept that the "Committee believed that [petitioner's] words and actions may have been designed simply to satisfy the requirements of bar admission," but also accept that "to the extent [petitioner] was remorseful, the Committee believed that it may have been remorse that his conduct interfered with his bar admission rather than a genuine appreciation for how his illegal conduct affected others." 194 Ill. 2d at 118-19. Again, there is no basis in this record from which the majority can reject the evidence presented during the hearing and speculate with respect to petitioner's motives.

Finally, the majority also accepts the Committee's conclusion that petitioner's work "did not entail the kind of independence or the exercise of judgment that would permit a prediction about how [he] would perform in a setting that did." 194 Ill. 2d at 118. It appears, however, that the Committee and the majority would require petitioner to perform the impossible: to present a record of "exercise of judgment" in a legal setting, comparable to that of an attorney, when petitioner cannot validly engage in such conduct. During his testimony, the Committee inquired of Robert Roy whether petitioner, while performing volunteer work at ECDO, had occasion to make "serious judgment calls." Roy replied that petitioner faced a dilemma, and explained that there is "a

fine line there, because when you start talking about serious judgment calls, what you're talking about is exercising discretion in the practice of law, and I never wanted to put [petitioner] in the position of doing that." Roy further testified that in an effort to remedy this dilemma, he advised petitioner to apply for a Rule 711 license, so that petitioner could perform limited legal services under his supervision. Roy testified that after this application was rejected, he was very mindful not to place petitioner in the position where his actions could be construed as the unauthorized practice of law.

The decision of the majority to deny petitioner's application, despite the fact that the record contains substantial, uncontradicted evidence of petitioner's rehabilitation and present good moral character and fitness to practice law, leads me to the conclusion that, in this case, the majority has determined that regardless of the amount of positive evidence presented in petitioner's favor, the nature of petitioner's offense automatically precludes his admission to the bar.

The clear and unmistakable effect of denying this petitioner the opportunity to sit for the bar examination is to impose additional punishment upon him after he has been tried and served the sentence which was deemed appropriate by agreement of the court and the prosecution in his criminal case. What Justice Heiple said in his dissenting opinion in *People v. Malchow*, 193 Ill. 2d 413 (2000), rings true here. Although *Malchow* presented facts and issues different from the matter at bar, Justice Heiple's thoughts are equally applicable here: "What matters is that the State has already had its opportunity to impose whatever measure of retribution against defendant the criminal law allows. Once an offender has served his sentence, the punishment must stop." *Malchow*, 193 Ill. 2d at 432 (Heiple, J., dissenting). In the case at bar, the punishment has not stopped, but contin-

ues. One wonders whether, because of the emphasis the majority places on the seriousness of his crime many years after petitioner served the sentence given him, many years after petitioner expressed remorse, and after many years of performing satisfactorily his work in the legal arena, petitioner will ever be allowed the opportunity to obtain a license to practice law.

For these reasons, I dissent from the denial of petitioner's application for admission to the bar.